# <u>Exhibit 1</u>

# OFFICE LEASE AGREEMENT

between

**400 Augusta Street Investors, LLC**
**as Landlord**

and

**Upstate Craft Beer, LLC**
**as Tenant**

**400 Augusta Street**
**Floor 1, Suite 140**
**Greenville, South Carolina**

Λ ·51Λ

## LEASE SUMMARY

A.  **Effective Date:**                          , 2015

B.  **Landlord:**           400 Augusta Street Investors, LLC

C.  **Tenant:**             Upstate Craft Beer, LLC

D.  **Premises:**           Approximately 2,713 Usable Square Feet / 3,190 Rentable Square Feet located on a portion of the first floor of the Building and being shown on **Exhibit A**

E.  **Building:**           The 36,240 Gross Square Foot / 35,527 Rentable Square Foot building having an address of 400 Augusta Street, Greenville, South Carolina

f
F.  **Term:**               Thirty-Six (36) months beginning on the Commencement Date and expiring on the Expiration Date with two (2) Renewal Periods – the first Renewal Period of forty-eight (48) months with Base Rent increasing 3% annually, and a second Renewal Period of forty-eight (48) months with rent being at market value (See Section 30 for terms applicable to Renewal Periods)

G.  **Commencement Date:**  July 1, 2015, subject to adjustment per Section 2

H.  **Expiration Date:**    Thirty- Six (36) months after the Commencement Date

I.  **Base Rent Schedule:** See **Exhibit E**

### For Initial Term of 36 months and First Renewal Period

| PERIOD OF TERM | BASE RENT RATE PER RENTABLE SQUARE FOOT PER ANNUM | MONTHLY BASE RENT | PERIOD BASE RENT |
|---|---|---|---|
| Months 1 - 12 | $14.50 | $3,854.58 | $46,255.00 |
| Months 13 - 24 | $15.00 | $3,987.50 | $47,850.00 |
| Months 25 - 36 | $15.50 | $4,120.42 | $49,445.00 |
| Months 37- 48 | $15.97 | $4,245.00 | $50,944.00 |
| Months 49- 60 | $16.45 | $4,373.00 | $52,476.00 |
| Months 61- 72 | $16.95 | $4,506.00 | $54,071.00 |
| Months 73- 86 | $17.46 | $4,642.00 | $55,697.00 |

51^

<u>LANDLORD CONSENT AGREEMENT</u>

This Landlord Consent Agreement ("Agreement") is entered as effective of this /8 day of October, 2015 (the "Effective Date") by and between 400 Augusta Street Investors, LLC ("Landlord") and Upstate Craft Beer, LLC ("Tenant").

RECITALS:

WHEREAS, Landlord and Tenant entered into that certain Lease dated March 13, 2015 (the "Original Lease"), as amended by that certain First Lease Amendment Agreement dated July 1, 2015 (the "First Amendment", and together with the Original Lease, the "Lease") with respect to certain leased premises located within a portion of a building having a street address of 400 Augusta Street, Greenville, South Carolina 29601 (the "Building") which premises are designated as Suite 140 (the "Leased Premises").

WHEREAS, Tenant will have a Carbon Dioxide ($CO_2$) bulk tank in a mechanical room of the Leased Premises that requires remote refilling to be accomplished by the use of a filling truck; and

WHEREAS, in order to accomplish the refilling by truck, a small filling outlet ("Filling Outlet") must be placed on the exterior of the Leased Premises in order to connect the $CO_2$ bulk tank to the refilling truck; and

WHEREAS, pursuant to Section 6 of the Lease, Tenant must receive Landlord's prior written consent for any such addition of a Filling Outlet; and

WHEREAS, Tenant has requested Landlord's consent to add a Filling Outlet to the Leased Premises as is outlined in Section 6 of the Lease; and

WHEREAS, Landlord agrees to provide such consent subject to the terms and conditions contained herein.

TERMS OF AGREEMENT:

NOW, THEREFORE, in and for the consideration of the mutual covenants contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

    1.    Definitions. Unless otherwise defined in this Agreement, all capitalized terms used in this Agreement shall have the respective meaning ascribed to them in the Lease.

    2.    Consent. Landlord consents to the Filling Outlet subject to the following terms and conditions:

SM

a. Tenant shall identify the proposed location of the Filling Outlet for Landlord's approval.

b. Tenant shall provide professionally-prepared specifications for the Filling Outlet ("Specifications") and shall present such Specifications for Landlord's review and approval, which shall be granted at Landlord's sole discretion. Any deficiency, mistake or error in design, although the same has the consent or approval of Landlord, shall be the sole responsibility of Tenant, and Tenant shall be liable for all costs and expenses which may be incurred in connection with or resulting from any such deficiency, mistake or error in design.

c. After receiving Landlord's approval of the Specifications, Tenant shall select a contractor licensed in the state of South Carolina ("Contractor") to construct the Filling Outlet. Tenant shall enter into a contract with the Contractor to construct and install the Filling Outlet, and Contractor shall construct and install the Filling Outlet in strict accordance with the Specifications. Such Contractor shall have in place insurance with coverage levels to an industry-standard, commercially reasonable amount, and Contractor shall provide a certificate of insurance naming Landlord as additional insured prior to commencing any work on the Filling Outlet and shall maintain such certificate during the term of its agreement with Tenant.

d. Tenant shall be responsible for all costs associated with constructing, installing, maintaining, and repairing the Filling Outlet, including but not limited to properly sealing any penetrations associated with such Filling Outlet. At the end of the Term of the Lease, Tenant shall be responsible for removal of the Filling Outlet and restoration of its location to the condition it was in at the Commencement Date of the Lease.

e. The Filling Outlet shall be constructed and installed in accordance with all applicable laws, ordinances, codes, and rules and regulations of governmental authorities.

f. Tenant shall be responsible for the cost associated with repair of any damage to the Building or to the Leased Premises and their surrounding areas associated with the Filling Outlet or its construction, installation, maintenance, or operation.

g. Tenant shall defend, hold harmless, and indemnify Landlord, and its employees, representatives, agents, mortgagees, and related persons from and against any and all losses, liabilities, costs, damages, expenses, causes of action, suits, claims or judgments in connection with loss of life, personal injury, and/or damage to property arising out of Tenant or Contractor's construction, installation, maintenance, or operations of the Filling Outlet.

**3.      No Future Consent**. This Agreement shall not be deemed a consent to any future modifications or alternations to the Leased Premises or Building by Tenant. Tenant shall not, without prior written consent of Landlord in each instance, modify or alter the Leased Premises, Building, or any part thereof.

**4.      No Waiver**. Nothing contained in this Agreement shall he construed to modify, waive or affect i) any of the provisions, covenants, or conditions in the Lease,

Xtw.

ii) any of Tenant's obligations under the Lease, or iii) any rights or remedies of Landlord under the Lease.

5.     **Counterparts; Full Force and Effect**. This Agreement may be executed in counterparts, and all such executed counterparts shall constitute the same agreement. This Agreement shall be subject and subordinate at all times to the Lease and all of its provisions, covenants, and conditions, and such Lease shall remain in full force and effect.

[SIGNATURES ON FOLLOWING PAGE]

Landlord and Tenant have executed or have caused their duly authorized representatives to execute and deliver this Landlord Consent Agreement effective as of the date last indicated below, which later date shall be inserted on page 1 of this Landlord Consent Agreement as the "Effective Date".


UPSTATE CRAFT BEER, LLC
Tenant

_____          10/16/15
Jacket Donald                               Date
Pj  ident


400 AUGUSTA STREET INVESTORS, LLC
Landlord

_____          /8 - 14-15
Slephen P. NAvarro                          Date
Manager

JVw.

| | | |
|---|---|---|
| J. | **Tenant's Proportionate Share:** | 9.0%, subject to adjustment as provided in Section 1(b) |
| K. | **Permitted Use:** | Craft brewery, pub, homebrew supply store, homebrew services store, and restaurant as set forth in Section 3 of this Lease but subject to other use limitations and restrictions set forth in this Lease |
| L. | **Security Deposit:** | $3,854.58 |
| M. | **Address of Landlord:** | 400 Augusta Street Investors, LLC<br>101 North Main Street<br>Suite 1400<br>Greenville, South Carolina 29601<br>Attention: Mr. Stephen Navarro<br><br>With a copy to:<br>CBRE, Inc.<br>PO Box 1508<br>Greenville, South Carolina 29602<br>Attention: Asset Services |
| N. | **Address of Tenant:** | Upstate Craft Beer, LLC<br>400 Augusta Street, Suite 140<br>Greenville, South Carolina 29601<br><br>With a copy to:<br>Brook Bristow, Attorney<br>Bradford Neal Martin & Associates, PA<br>PO Box 10410<br>Greenville, South Carolina 29603 |
| O. | **Broker(s):** | CBRE, Inc. ("Landlord's Broker")<br>Spencer / Hines Properties ("Tenant's Broker") |
| P. | **Landlord's Contribution:** | Seven and 50/100 Dollars ($7.50) multiplied by the Usable Square Feet in the Premises, per **Exhibit C** |
| Q. | **Renewal Period:** | Two (2) Renewal Periods – the first Renewal Period of forty-eight (48) months with continual three percent (3%) annual increases, and a second Renewal Period of forty-eight (48) months with Base Rent being at fair market value (See Section 30 for terms applicable to Renewal Periods) |

**THE PROVISIONS OF THIS LEASE SUMMARY ARE MADE A PART OF THE LEASE.**

A
5∧

## TABLE OF CONTENTS

1.  PREMISES.................................................................................................1
2.  TERM......................................................................................................3
3.  USE.........................................................................................................3
4.  RENT.......................................................................................................4
5.  UTILITIES; SERVICES BY LANDLORD .................................................8
6.  TENANT'S ACCEPTANCE AND MAINTENANCE OF PREMISES;
    LANDLORD'S DUTIES AND RIGHTS ....................................................9
7.  DAMAGES TO PREMISES.....................................................................12
8.  ASSIGNMENT - SUBLEASE ...............................................................13
9.  TENANT'S COMPLIANCE; INSURANCE REQUIREMENTS ..................15
10. SUBORDINATION-ATTORNMENT - LANDLORD FINANCING...............16
11. SIGNS....................................................................................................17
12. ACCESS TO PREMISES .........................................................................17
13. DEFAULT ..............................................................................................18
14. MULTIPLE DEFAULTS ..........................................................................19
15. PROPERTY OF TENANT ........................................................................**20**
16. BANKRUPTCY .......................................................................................20
17. EMINENT DOMAIN ..............................................................................**21**
18. ADA GENERAL COMPLIANCE .............................................................21
19. QUIET ENJOYMENT..............................................................................21
20. NOTICES ...............................................................................................**22**
21. ESTOPPEL CERTIFICATE ......................................................................23
22. HOLDING OVER.....................................................................................23
23. BROKER'S COMMISSION ......................................................................23
24. ENVIRONMENTAL COMPLIANCE ........................................................24
25. MOLD ....................................................................................................25
26. LEED CERTIFICATION ...........................................................................26
27. ARTS PROGRAM....................................................................................26
28. NEW MARKETS TAX CREDIT REQUIREMENTS ....................................27
29. MISCELLANEOUS .................................................................................28
30. RENEWAL PERIOD ...............................................................................29
31. FIRST RIGHT OF REFUSAL....................................................................30
32. ANTI-TERRORISM CERTIFICATION......................................................31

£
5ʌ

STATE OF SOUTH CAROLINA  )
                                    )         **LEASE**

COUNTY OF GREENVILLE      )

THIS LEASE (the "Lease"), is made this __13__ day of __March__, 2015 ("Effective Date"), by and between 400 AUGUSTA STREET INVESTORS, LLC, a South Carolina limited liability company, (hereinafter referred to as the "Landlord"), and UPSTATE CRAFT BEER, LLC, a South Carolina limited liability company (hereinafter referred to as the "Tenant"):

## WITNESSETH

Upon the terms and conditions hereinafter set forth, Landlord leases to the Tenant and Tenant leases from Landlord property referred to as the Premises, all as follows:

1.     PREMISES.

(a)     The property hereby leased to Tenant is that area shown on Exhibit A hereto attached, which consists of approximately two thousand seven hundred and thirteen (2,713) Usable Square Feet and three thousand one hundred and ninety (3,190) Rentable Square Feet, which is located on the first floor and designated as Suite 140 (hereinafter referred to as the "Premises"), in the building containing approximately Thirty Five Thousand Five Hundred Twenty Seven (35,527) Rentable Square Feet known as "400 Augusta Street" (hereinafter referred to as the "Building") on a tract of land located at 400 Augusta Street, Greenville, South Carolina 29601, more particularly described on Exhibit B attached hereto (together with the Building, hereinafter referred to as the "Property"). The terms "Usable Square Feet" and "Rentable Square Feet", as used herein, shall refer to the usable square feet and rentable square feet as calculated by Builders and Office Managers Association ("BOMA") standards. Although the Premises are intended to be approximately 2,713 Usable Square Feet and 3,190 Rentable Square Feet, as identified on Exhibit A as Space "140" of the first floor and attached hereto, the actual amount of Usable Square Feet and Rentable Square Feet of the Premises shall be determined by measurements made by the Landlord's architect in accordance with the current BOMA standards in place as of the Effective Date. At the time that the actual Rentable Square Feet and Usable Square Feet of the Premises are determined by the Landlord's architect, Landlord and Tenant shall execute an amendment to this Lease to reflect the floor plans and actual area of the Premises and any revisions to the Rent. Landlord and Tenant desire for improvements to be made to the Premises prior to the Commencement Date, and such improvements shall be made pursuant to the work letter ("Work Letter") attached hereto as Exhibit C.

(b)     Except as expressly set forth in this Section 1(b), Tenant shall have the right to place tables and chairs in the Outdoor Seating Area (as hereinafter defined) and construct and install a door directly between the Premises and the Outdoor Seating Area. In the event Tenant is able to obtain, at Tenant's sole cost and expense, all necessary approvals and/or licenses required to provide outdoor seating for Tenant's customers, then subject to the terms

1

and conditions set forth herein, and provided Tenant is not in default of the Lease, Landlord hereby grants to Tenant a license to install tables and chairs and install fencing (said fencing subject to the approval of Landlord) directly adjacent to the Premises in the area depicted as the outdoor seating area on a portion of <u>Exhibit A-1</u> attached hereto (said area being referred to as the "<u>Outdoor Seating Area</u>"). The configuration of the Outdoor Seating Area shall be subject to Landlord's prior written approval in Landlord's sole discretion, in accordance with plans and specifications (including specifications and locations for the access, table, seating and fencing to be used by Tenant in the Outdoor Seating Area) approved in advance, in writing, by Landlord. The access door, tables, seating and fencing to be installed and used by Tenant in the Outdoor Seating Area shall be of a quality typically found in a Class A mixed used development. Said improvements shall be made at Tenant's sole expense and used for serving Tenant's customers in connection with Tenant's permitted use of the Premises. Tenant shall not be permitted to restrict access to the Outdoor Seating Area, or to, in any way, restrict access to the sidewalks and common areas of the Property in violation of any law or insurance requirement. Landlord and Tenant acknowledge that Tenant's Outdoor Seating Area is considered "common area" which all tenants in the Property are permitted to utilize. Thus, in the event that any other tenant makes a complaint to Landlord based on Tenant's failure to maintain applicable codes and regulations of governing authorities, and Tenant fails to cure such improper maintenance and/or code violation within ten (10) days following Landlord's notice, Landlord shall have the right to revoke Tenant's use of the Outdoor Seating Area upon five (5) days prior written notice to Tenant. In addition, if Tenant is in default of the Lease, beyond any applicable notice and cure period, Landlord shall have the right to automatically revoke Tenant's use of Tenant's Outdoor Seating Area upon written notice to Tenant. In the event Tenant fails to remove its Outdoor Seating Area (including all tables, chairs and fencing) upon demand from Landlord, or fails to comply with any other provision provided herein, Landlord shall have the right to remove all items (including tables, chairs and fencing) from Tenant's Outdoor Seating Area and store said items, all at Tenant's cost and expense. In the event Landlord removes Tenant's Outdoor Seating Area, Tenant shall reimburse Landlord upon demand for any costs incurred in the removal or storage of any items in Tenant's Outdoor Seating Area and said reimbursement shall be deemed Additional Rent under the Lease. Tenant shall be responsible for the maintenance, including, without limitation, daily trash removal and landscaping, of the Outdoor Seating Area. Prior to Tenant's use of the Outdoor Seating Area, Tenant shall provide evidence satisfactory to Landlord, in Landlord's sole discretion, that Tenant's insurance specifically includes coverage for the Outdoor Seating Area. As well, Tenant shall provide Landlord with copies of all necessary approvals and permits from the applicable governmental authorities for use of the Outdoor Seating Area prior to Tenant's installation or use thereof. Tenant's failure to expressly comply with the requirements of this Section 1(b) shall be deemed an immediate default under this Lease, and upon such default, Landlord shall have the right, without limitation, to terminate Tenant's right to use the Outdoor Seating Area. To the extent of any conflict between the terms of this Section 1(b) and the Rules and Regulations set forth in <u>Exhibit D</u> attached hereto the terms of this Section 1(b) shall control.

(c)    As long as Tenant is entitled to possession of the Premises, Tenant shall have the nonexclusive right to use any parking areas, driveways, sidewalks, stairways and other common facilities of the Property as they may exist from time to time. It is understood that the

*St**

Landlord has provided one hundred eighteen (118) non-exclusive surface parking spaces for the use of the Tenant, other tenants in the Building and customers, guests and other invitees of the tenants in the Building. Landlord shall establish the maximum number of parking spaces that may be used, non-exclusively, by the Tenant and its employees, agents, contractors, representatives or invitees ("Parking Standard"). Landlord shall also have the right to modify or amend the Parking Standard from time to time; provided, however, that the number of parking spaces available for Tenant's use under the Parking Standard shall not be less than the total number of parking spaces in the Property times Tenant's Proportionate Share defined in Section 4.2(e) below without Tenant's consent, not to be unreasonably withheld. In the event that the Tenant's usage of the parking spaces exceeds the Parking Standard, Landlord shall have the right, at Tenant's sole cost and expense, after written notice affording Tenant a reasonable opportunity to comply with the Parking Standard, to tow any vehicles of Tenant or its employees, agents, contractors, representatives or invitees violating the Parking Standard or to require Tenant to adopt some other alternative plan to ensure that the Parking Standard is not exceeded.

2.    TERM.    The term of this Lease (hereinafter referred to as either the "Lease Term" or "Term") is for thirty-six (36) months, and shall commence on July 1, 2015 (the "Commencement Date") and shall expire (unless sooner terminated or extended as herein provided) at midnight on the last day of the calendar month that is thirty-six (36) months after the Commencement Date (hereinafter referred to as the "Expiration Date"). If the Commencement Date is other than the first day of a calendar month, the Term shall run for the number of months set forth above from the first day of the calendar month following the Commencement Date. In the event Landlord shall permit Tenant to take possession of the Premises prior to the Commencement Date referenced above, all the terms and conditions of this Lease shall apply except for the payment of Rent, which payment shall begin on the Commencement Date.

3.    USE.    Subject in all respects to the use limitations and restrictions set forth in this Lease, the Premises may be used only as a craft brewery, pub, homebrew supply store, homebrew services store, and restaurant but for no other use without Landlord's prior written consent. Notwithstanding the foregoing, the Premises may not be used for any Tenant Excluded Business (as such term is defined below) and as further set forth below. Tenant shall never make any use of the Premises which is in violation of any governmental laws, rules or regulations, whether now existing or hereafter enacted or which is in violation of the general rules and regulations for tenants of the Building (a copy of the present rules are attached as Exhibit D) as may be developed or modified from time to time by Landlord effective as of the date delivered to Tenant or posted on the Premises providing such rules are uniformly applicable to all tenants in the Building (hereinafter referred to as the "Rules and Regulations"), nor may Tenant make any use of the Premises not permitted, or otherwise prohibited, by any restrictive covenants which apply to the Premises and have been disclosed by Landlord to Tenant. Tenant may not make any use which is or may be a nuisance or trespass, which increases any insurance premiums, or makes such insurance unavailable to Landlord on the Building. In the event of an increase in any of Landlord's insurance premiums which results from Tenant's use or occupancy of the Premises, if Tenant does not pay Landlord, on demand, the amount of such increase, Landlord may treat such use as a default hereunder. Tenant shall not use or operate the Premises in any mamier that will cause the Building or any part thereof

3

not to conform with the desired certification of the Building pursuant to the U.S. Green Building Council's Leadership in Energy and Environmental Design (LEED) rating system.

Landlord is using New Market Tax Credit financing for the Building. As a condition of that financing, it is required that Tenant represent and agree that it is not currently engaged, and that throughout the term of the Lease it will not become engaged, in any of the trades or businesses, either as a principal or an ancillary business, that are defined as excluded businesses under Section 1.45D-1(d)(5)(iii)(B) of the Federal Income Tax Regulations promulgated under the Internal Revenue Code of 1986, as amended to date (each a **"Tenant Excluded Business"**). Tenant Excluded Businesses are defined as follows: the operation of any private or commercial golf course, country club, massage parlor, hot tub facility, suntan facility, racetrack or other facility used for gambling, or any store the principal activity of which is the sale of alcoholic beverages for consumption off premises.

Tenant represents, covenants and warrants that to the extent subleasing is permitted under the terms of the Lease, it will not sublease all or any portion of the Premises to any party that is, or during the term of the Lease may become engaged, either as a principal or an ancillary business, in the operation of a Tenant Excluded Business.

Tenant understands and agrees that any violation under this Section 3 shall constitute a default under the Lease and shall be grounds for immediate termination of the Lease, and Tenant shall have no right to cure such default notwithstanding any other provision of this Lease; provided, however, with respect to an initial default under this Section 3, Landlord shall give Tenant notice of such default, and Tenant shall have ten (10) days to cure such default but with respect to any subsequent defaults under this Section 3, Tenant shall no notice and cure period, and with respect to any subsequent defaults under this Section 3, Landlord shall have the right to immediately exercise all of its rights and remedies upon any subsequent defaults under this Section 3, including the right to terminate this Lease.

4.    RENT. As used herein, the term "Rent" shall mean Base Rent (as hereinafter defined) plus Additional Rent (as hereinafter defined). Tenant shall pay to Landlord Rent on or before the first day of each calendar month during the Term, without previous demand or notice therefor by Landlord and without set-off or deduction, provided, however, if the Term commences on a day other than the first day of the calendar month, then Rent for such month shall be (i) prorated for the period between the Commencement Date and the last day of the month in which the Commencement Date falls, and (ii) due and payable on the Commencement Date. Notwithstanding anything contained herein to the contrary, Tenant's obligation to pay Rent under this Lease is completely separate and independent from any of Landlord's obligations under this Lease. For each monthly Rent payment Landlord receives after the fifth (5th) day of the month Landlord shall be entitled to all remedies provided under Sections 13 and 14 below, and a late charge in the amount of five percent (5%) of all Rent due for such month together with late notice processing fee of Twenty Five & 00/100 ($25.00) Dollars per month. If Landlord presents Tenant's check to any bank and the Tenant has insufficient funds to pay for such check, then Landlord shall be entitled to all remedies provided under Sections 13 and 14 below, a lawful bad check fee of Fifty and No/100 Dollars ($50.00) Dollars for each check, and the Landlord shall have the right, upon providing notice to the Tenant, to require the Tenant to make all

9*

Sr*

subsequent payments of Rent by cashier's check or money order.

    4.1    BASE RENT. Tenant shall pay minimum annual rent (hereinafter referred to as the "Base Rent") in monthly installments in advance on or before the first day of each month as reflected in Exhibit E hereto beginning on the Commencement Date.

    4.2    ADDITIONAL RENT. This Lease is a triple net lease, and in addition to the Base Rent due hereunder, Tenant shall be responsible, as "Additional Rent", for all insurance, taxes, and maintenance expenses as hereinafter in this Lease more particularly described, it being generally understood and agreed that Landlord shall not be responsible for any costs or expenses in connection with the Premises during the Term of this Lease and shall be entitled to a net return of the rental herein specified undiminished by the cost of insurance, taxes, and assessments for water, electrical, gas, sewer or other utility charges or levies of any kind or nature whatsoever, now or at any time hereafter, during the term of this Lease or any renewal or extension hereof, except where otherwise specifically provided to the contrary herein.

    Tenant shall pay, without deduction or offset of any kind, to Landlord as Additional Rent for the Premises during the term the amounts including but not limited to those specified in this Section 4.2, Section 5 or elsewhere in this Lease. Landlord may require Tenant pay Additional Rent monthly on an estimated basis, which requirement and estimate shall be at Landlord's reasonable discretion. Tenant shall deposit with Landlord the first monthly Additional Rent installment no later than the Commencement Date. Failure of Tenant to pay any of the charges as in this Section required to be paid shall constitute a default under the terms hereof in like manner as failure to pay Rent when due.

    (a)    Tenant's Share of Operating Expenses. Tenant, during the Term and any renewal or extension periods, hereby covenants and agrees and shall be obligated to pay to Landlord, as Additional Rent, Tenant's Proportionate Share (as defined herein below) of Operating Expenses of repairing, maintaining, and operating the Property. These payments shall be in addition to and not in lieu of any other payments due from Tenant hereunder. The term "Operating Expenses" shall mean any and all operating expenses of the Property, Building, and related areas (such as, by way of illustration but not limitation, the parking areas), determined consistently with industry standards, computed on an accrual basis and including all expenses, costs, and disbursements of every kind and nature, which Landlord (i) shall pay and/or (ii) become obligated to pay, including, but not limited to the following:

    (i)    Costs, wages and salaries of all persons engaged in the management, operation, repair, security or maintenance of the Property, including, but not limited to, fringe benefits, taxes, insurance and any other benefits relating thereto;

    (ii)    All supplies and materials used in the operation and maintenance of the Property;

    (iii)    Cost of all utilities, including, without limitation, electricity, telephone, water, sewer, power, gas heating, lighting, and air conditioning for the Building and other Building Areas, except to the extent such utilities are charged directly to, or

paid directly by, a tenant of the Building;

(iv)    Cost of all service agreements and maintenance for the Property and the equipment therein, including, but not limited to, trash removal, security services, alarm services, window cleaning, janitorial service, grounds maintenance, HVAC maintenance, and grounds maintenance;

(v)    Cost of repairs and general maintenance of the interior and exterior of the Property and Building (including, but not limited to, light bulbs and glass breakage; the redecorating, repainting, recarpeting and other such work of any common areas; heating, ventilation and air conditioning equipment; plumbing and electrical equipment), parking areas, and landscaping;

(vi)    A reasonable management fee and other expenses incurred for the general operation and management of the Property based on competitive rates comparable to those paid in the Greenville, South Carolina market which shall not exceed five percent (5%) per annum of the gross revenues of the Property;

(vii)    An amortization cost due to any capital expenditures incurred (i) which have the effect of reducing or limiting Operating Expenses of the Property, if such reduction or limitation inures to Tenant's benefit (but only to the extent and in the amount that such Operating Costs of the Property are reduced); (ii) which may be required by governmental authority or by Landlord's insurance carrier; or (iii) which are designed to protect or enhance the health, safety or welfare of the tenants in the Property or their invitees.

(viii)    Legal and accounting fees and expenses;

(ix)    Consulting fees and expenses of all contractors and consultants in connection with the management, operation, maintenance and repair of the Property;

(x)    All costs of maintaining, managing, reporting, and re-commissioning the Building or any part thereof that was designed and/or built to be sustainable and conform with the U.S. Green Building Council's Leadership in Energy and Environmental Design (LEED) rating system and all costs of applying, reporting and commissioning the Building or any part thereof to seek re-certification (if re-certification is required) under the U.S. Green Building Council's Leadership in Energy and Environmental Design (LEED) rating system; provided however, the cost of such applying, reporting and commissioning of the Building or any part thereof to seek re-certification (if re-certification is required) shall be a cost capitalized and thereafter amortized as an Operating Expense under GAAP.

(xi) Anything which could be classified as an Operating Expense under generally accepted accounting principles, consistently applied, but not specified or expressly set forth hereunder.

(b)    Tenant's Share of Real Estate Taxes.  Tenant, during the Term

and any renewal or extension periods, hereby covenants and agrees and shall be obligated to pay to Landlord, as Additional Rent, Tenant's Proportionate Share of Taxes. These payments shall be in addition to and not in lieu of any other payments due from Tenant hereunder. The term "Taxes," as adjusted pursuant to the terms of this Lease, shall mean any and all taxes (ad valorem or otherwise), assessments, and governmental charges whether federal, state, county, or municipal, and whether by taxing districts or authorities presently taxing the Property or by others, subsequently created or otherwise, and any other taxes (other than federal and state income taxes), and assessments attributable to the Property or its operation and any reasonable consultants fees incurred with respect to issues or concerns involving the taxes or the Property, or both, but excluding any estate, inheritance, transfer, intangible or franchise taxes. Landlord shall have the right to have the Ball Building property ("Ball Building Property") separated into a separate tax parcel from the remainder of the Property. If Landlord, at its sole discretion, chooses to separate the Ball Building Property into a separate tax parcel and the Ball Building Property is not used as a common area for the benefit of all tenants of the Building, real estate taxes for such separate tax parcel shall not be included as Taxes under this Lease. Additionally so long as the Ball Building Property is leased to another party, is not taxed as a separate tax parcel and is not used as a common area for the benefit of all tenants of the Building, $2,040 shall be excluded from Taxes for that portion of the real estate taxes attributable to the Ball Building Property and such $2,040 excluded amount shall be increased commencing 2016 and each year thereafter based on the percentage increase each year in real estate taxes applicable to the Property.

(c)    Tenant's Share of Insurance Costs. Tenant, during the Term and any renewal or extension periods, hereby covenants and agrees and shall be obligated to pay to Landlord, as Additional Rent, Tenant's Proportionate Share of Insurance. These payments shall be in addition to and not in lieu of any other payments due from Tenant hereunder. The term "Insurance", as adjusted pursuant to the terms of this Lease shall mean the cost of all insurance relating the Property including, but not limited to, the cost of casualty insurance and liability insurance applicable to the Property and Landlord's personal property used in connection therewith obtained by Landlord at competitive rates in the Greenville, South Carolina area.

(d)    Additional Rent Estimated and Paid Monthly.    The Tenant's Proportionate Share of Operating Expenses, Real Estate Taxes, and Insurance Costs to be paid by Tenant shall be a percentage of each based upon the proportion that the Rentable Area (as hereinafter defined) of the Premises bears to the total Rentable Area of the Building, as defined herein below. Landlord shall estimate the total amount of Operating Expenses, Real Estate Taxes, and Insurance Premiums to be paid by Tenant during each calendar year and promptly after the beginning of each calendar year or partial calendar year during the Term and Tenant shall pay to Landlord one-twelfth (1/12) of such sum on the first day of each calendar month during each such calendar year, or part thereof, during the Term. By March 1st of each Lease year or as soon thereafter as practicable, Landlord shall submit to Tenant a revised estimate of Operating Expenses, Taxes and Insurance for the current Lease year, together with a detailed statement of the actual amount of Operating Expenses, Taxes, and Insurance along with supporting documentation for the prior calendar year. Within thirty (30) days after receipt of such statements, Tenant shall pay any deficiency between the actual amount owed and the estimates paid during such calendar year, or in the event of overpayment, Landlord shall, at

7

Landlord's option, credit the amount of such overpayment toward the next installment of Operating Expenses, Taxes, or Insurance, or refund the amount of such overpayment to Tenant. The provisions of this section shall survive the termination or expiration of this Lease, except that Landlord shall not have the option to credit any amounts owed to Tenant. If the Rent Commencement Date shall fall on other than the first day of the calendar year, or if the Expiration Date shall fall on other than the last day of the calendar year, Tenant's share of the Operating Expenses, Taxes, and Insurance for such calendar year shall be apportioned pro rata.

      (e)   Proportionate Share Calculation. "Tenant's Proportionate Share" of shall mean the percentage determined by dividing the Rentable Area of Tenant's Premises (3,190 Rentable Square Feet) by the total Building Rentable Area (35,527 Rentable Square Feet) and is herein fixed as 9.0% but subject to adjustment as provided in Section 1(b). The term "Rentable Area", as used herein, shall refer to the rentable area as calculated by BOMA standards. Notwithstanding anything to the contrary contained herein, if the Building is not fully occupied during any calendar year, appropriate adjustments shall be made to determine Operating Expenses, Taxes and Insurance as though the Building had been fully occupied in such calendar year for the entire calendar year.

    5.     UTILITIES; SERVICES BY LANDLORD.

      Tenant shall purchase and pay for all utility services provided to the Premises, and Tenant shall provide and directly pay for all janitorial, garbage, cleaning and extermination services for the Premises.  For any utilities which are metered to reflect only Tenant's consumption of such utility, Tenant shall pay utility charges directly to the utility or municipality providing such service; all charges shall be paid by Tenant before they become delinquent.  For any utilities which are metered to reflect the consumption of such utility with respect to a particular floor of the Building ("Floor"), Landlord shall directly bill Tenant on a monthly basis for Tenant's share of such utility's costs, which share shall be the percentage determined by dividing the Rentable Area of the Premises by the total Rentable Area of the Floor which is occupied by Tenant and any other Tenants of the Floor during such month. For any utilities which are metered to reflect the consumption of such utility with respect to the entire Building, Landlord shall directly bill Tenant on a monthly basis for Tenant's share of such utility's costs, which share shall be the percentage determined by dividing the Rentable Area of the Premises by the total Rentable Area of the Building which is occupied by Tenant and any other tenants of the Building during such month. Tenant shall be solely responsible for the repair and maintenance of any meters or other utility connections and infrastructure necessary in connection with such services.  Landlord shall not be liable for any damage or injury from the interruption or failure of utilities.  Tenant's use of electrical energy in the Premises shall not, at any time, exceed the capacity of either or both of (x) any of the electrical conductors and equipment in or otherwise servicing the Premises; and (y) the HVAC systems of the Premises.

      Landlord shall have the right to enter and inspect the Premises and all electrical devices therein from time to time. Tenant shall not install equipment with unusual demands for heating, air conditioning, or electricity without Landlord's prior written consent, which Landlord may withhold if it determines that in its opinion such equipment may not be safely used in the

Premises or that electrical service is not adequate therefor. If heat-generating machines or equipment or occupancy in excess of the design basis specified above or other intensive activities shall be used or carried on in the Premises by Tenant which affect the temperature otherwise maintained by the heating and air conditioning system, Landlord shall have the right to install supplemental air conditioning units in the Premises and the cost thereof, including the cost of engineering and installation, and the cost of operation and maintenance thereof, shall be paid by Tenant upon demand by Landlord.

Landlord shall cause to be furnished to the Building, or as expressly noted in this Section, to the Premises, in common with other tenants, during business hours of 7:00 a.m. and 6:00 p.m. Monday through Friday and 8:00 a.m. to 1:00 p.m. on Saturdays (excluding national and State holidays) the following services (the cost of which services shall be reimbursed to Landlord as Additional Rent in accordance with Section 4 above): janitorial services for all common areas, water (if available from city mains) for drinking, lavatory and toilet purposes for the Premises and the Building, natural gas to the Premises and Building, and heating and air conditioning for the reasonably comfortable use and occupancy of the Premises and the Building, provided heating and cooling conforming to any governmental regulation prescribing limitations thereon shall be deemed to comply with this service. The cost of all services provided by Landlord hereunder shall be included within Operating Expenses, unless charged directly (and not as a part of Operating Expenses) to Tenant or another tenant of the Building.

There shall be no abatement or reduction of Rent by reason of any of the foregoing services not being continuously provided to Tenant. Tenant shall report to Landlord immediately any defective condition in or about the Premises known to Tenant and if such defect is not so reported and such failure to promptly report results in other damage, Tenant shall be liable for same.

Landlord shall not be liable to Tenant for any damages caused to Tenant and its property due to the Building or any part of appurtenance thereof being improperly constructed or being or becoming out of repair, or arising from the leaking of gas, water, sewer or steam pipes, or from problems with electrical service except in the event of Landlord's gross negligence or willful misconduct.

6.    TENANT'S ACCEPTANCE AND MAINTENANCE OF PREMISES; LANDLORD'S DUTIES AND RIGHTS. Except for Landlord's Work to be completed by Landlord, Tenant accepts tire Premises, Building, and Property from Landlord in "as is" condition as of the Commencement Date, and Landlord shall have no obligation to modify, alter, or make improvements to the Premises. In consideration of the foregoing, Landlord shall provide Tenant with Landlord's Contribution (as defined in Exhibit C attached hereto) payable in accordance with Exhibit C attached hereto. Performance of Tenant's Work (as defined in Exhibit C) by Tenant shall be subject to Exhibit C attached hereto. Tenant agrees that Landlord may undertake Landlord's Work during such time as Tenant is performing Tenant's Work and Tenant agrees that Tenant and its contractors and subcontractors shall not interfere with, hinder or delay any work being performed by Landlord and Landlord's contractors in connection with the performance of Landlord's Work. Notwithstanding the foregoing, following delivery of the Premises, but prior to Tenant's moving into the Premises, Tenant shall have the right to inspect

9

the Premises with Landlord's representative and Tenant shall have the right to deliver to Landlord a punch list of any incomplete or faulty items describing those items not completed in the Premises at the time of the delivery of the Premises, as identified in a written list.  Subject to the terms of <u>Exhibit C</u>, Tenant's occupancy of the Premises is Tenant's representation to Landlord that it has examined and inspected the same, finds the Premises to be as represented by Landlord and satisfactory for Tenant's intended use, and constitutes Tenant's acceptance "as is", subject to the completion by Landlord of any incomplete or faulty items included in such punch list. Except for Landlord's warranty that the condition of the Premises shall be in accordance with Landlord's Work as of the date of the completion of Landlord's Work, Landlord makes no other warranty as to the condition of said Premises. During Tenant move-in, a representative of the Tenant must be onsite with Tenant's moving company to ensure proper treatment of the Building and the Premises. All packing material and refuse must be property disposed of by Tenant in accordance with the Rules and Regulations. Any damage or destruction to the Building or the Premises due to moving will be the sole responsibility of the Tenant. Tenant shall deliver at the end of this Lease each and every part of the Premises in good repair and condition, ordinary wear and tear and damages by insured casualty excepted. The delivery of keys or other such tender of possession of the Premises to Landlord or to an employee of Landlord shall not operate as a termination of this Lease or a surrender of Premises except upon written notice by Landlord.

Tenant shall: (a) keep and maintain the Premises, the fixtures and appurtenances therein and the mechanical systems serving the Premises in good order, condition, and repair; (b) make all necessary repairs to the Premises (other than those which Landlord is obligated to make under this Section 6) and make repairs and replacements to Building needed because of Tenant's misuse or primary negligence; (c) repair and replace special equipment or decorative treatments installed by or at Tenant's request and that serve the Premises only, except if this Lease is ended because of casualty loss or condemnation; and (d) not commit waste. However, except as set forth on <u>Exhibit C</u> as part of Tenant's Work, Tenant shall make no structural modifications or alterations to the Premises or the Building under any circumstances and shall make no interior alterations of the Premises without the prior written consent of the Landlord. If Tenant desires to make any interior alterations to the Premises, Tenant shall provide Landlord with a complete set of construction drawings and specifications and the identity of the contractor(s) that the Tenant proposes to use for the alterations for the Landlord's review and approval. In the event that Landlord consents to Tenant's proposed alterations to the Premises, then Tenant shall complete the alterations, at its expense, in accordance with the drawings and specifications that have been approved by Landlord and shall only use the contractor(s) that have been approved by Landlord. On termination of this Lease or vacation of the Premises by Tenant, Tenant shall restore the Premises, at Tenant's sole expense, to the same condition as existed at the Commencement Date, ordinary wear and tear and damage by insured casualty only excepted. Landlord, however, may elect to require Tenant to leave alterations pertained for Tenant unless at the time of such alterations Landlord agreed in writing such alteration could be removed on Expiration Date. All maintenance and repairs made by Tenant must comply with Landlord's sustainability practices, including any third-party rating system concerning the environmental compliance of the Building or the Premises, as the same may change from time to time.

Tenant shall keep the Premises and the Building free from any liens arising out

of any work performed, materials furnished, or obligations incurred by or on behalf of Tenant. Should any claim of lien or other lien filed against the Premises or the Building by reason of any act or omission of Tenant or any of Tenant's agents, employees, contractors or representatives, Tenant shall cause the same to be cancelled and discharged of record by bond or otherwise within a ten (10) day period, Landlord may discharge the same, in which event Tenant shall reimburse Landlord, on demand, as Additional Rent, for the amount of the lien or the amount of the bond, if greater, plus all administrative costs and attorney's fees incurred by Landlord in connection therewith. The remedies provided herein shall be in addition to all other remedies available to Landlord under this Lease or otherwise. Tenant shall have no power to do any act or make any contract that may create or be the foundation of any lien, mortgage, or other encumbrance upon the reversionary or other estate of Landlord, or any interest of Landlord in the Premises. NO CONSTRUCTION LIENS OR OTHER LIENS FOR ANY LABOR, SERVICES OR MATERIALS FURNISHED TO THE PREMISES BY TENANT SHALL ATTACH TO OR AFFECT THE INTEREST OF LANDLORD IN AND TO THE PREMISES OR THE BUILDING.

Notwithstanding anything to the contrary set forth above in this Section 6, if Tenant does not perform its maintenance or repair obligations in a timely manner as set forth in this Lease, commencing the same within fifteen (15) days of receipt of notice from Landlord specifying the work needed and thereafter diligently and continuously pursuing completion of unfulfilled maintenance obligations, then Landlord shall have the right, but not the obligation, to perform such maintenance, and any amounts so expended by Landlord shall be paid by Tenant to Landlord within thirty (30) days after demand, with interest at the maximum rate allowed by law (or the rate of fifteen percent (15%) per annum, whichever is less) from the date of expenditure through the date paid.

Landlord shall pay for and make repairs and replacements to keep and maintain the common areas and structural portions of the Building (including Building fixtures and equipment) in good order and repair. Landlord's maintenance, repair and replacement shall include the roof, foundation, exterior walls, interior structural walls, all structural components, and all exterior (outside of walls) systems, such as roof top mechanical, base electrical, plumbing covering the common areas, parking lots and drives, exterior glass on the Building, and damage to any improvements to the Premises required to be covered (or actually covered) under Landlord's Insurance. All costs of Landlord's maintenance, repair, and replacement (excluding replacements constituting capital expenditures) shall be Operating Expenses as defined in Section 4.2 of this Lease. Repairs or replacements required under Section 6 shall be made within a reasonable time (depending on the nature of the repair or replacement needed) after receiving notice from Tenant or having actual knowledge of the need for a repair or replacement.

7.      DAMAGES TO PREMISES. If the Premises shall be partially damaged by fire or other casualty insured under Landlord's insurance policies, and if Landlord's lender(s) shall permit insurance proceeds paid as a result thereof to be so used, then upon receipt of the insurance proceeds, Landlord shall, except as otherwise provided herein, promptly repair and restore the Premises (exclusive of improvements made by Tenant, Tenant's trade fixtures, decorations, signs and contents) substantially to the condition thereof immediately prior to such damage or destruction; limited, however, to the extent of the insurance proceeds received by

Landlord. If by reason of such occurrence: (a) the Premises is rendered wholly untenantable; (b) the Premises is damaged in whole or in part as a result of a risk which is not covered by Landlord's insurance policies; (c) Landlord's lender does not permit a sufficient amount of the insurance proceeds to be used for restoration purposes; (d) the Premises is damaged in whole or in part during the last two years of the Lease term; or (e) the Building containing the Premises is damaged (whether or not the Premises is damaged) to an extent of fifty percent (50%) or more of the fair market value thereof, Landlord may elect either to repair the damage as aforesaid, or to cancel this Lease by written notice of cancellation given to Tenant within sixty (60) days after the date of such occurrence, and thereupon this Lease shall terminate. Tenant shall vacate and surrender the Premises to Landlord within fifteen (15) days after receipt of such notice of termination. In addition, Tenant may also terminate this Lease by written notice given to Landlord at any time between the one hundred eighty-first (181st) and two hundred tenth (210th) day after the occurrence of any such casualty, if Landlord has failed to restore the damaged portions of the Building (including the Premises) within one hundred eighty (180) days of such casualty. However, if Landlord is prevented by delays beyond its reasonable control ("Delays"), from completing the restoration within said one hundred eighty (180) day period, and if Landlord provides Tenant with written notice of such cause for Delay within fifteen (15) days of the occurrence thereof, said notice to contain the reason for Delay and a good faith estimate of the period of the Delay caused thereby, then Landlord shall have an additional period beyond said one hundred eighty (180) days, equal to the Delays in which to restore the damaged areas of the Building; and Tenant may not elect to terminate this Lease until said additional period required for completion has expired with the Building not having been substantially restored. In such case, Tenant's fifteen (15) day notice of termination period shall begin to run upon the expiration of Landlord's additional period for restoration set forth in the preceding sentence. Upon the termination of this Lease as aforesaid, Tenant's liability for the Rent and other charges reserved hereunder shall cease as of the effective date of the termination of this Lease, subject, however, to the provisions for abatement of Rent hereinafter set forth.

Unless this Lease is terminated as aforesaid, the Lease shall remain in full force and effect and Tenant shall promptly repair, restore, or replace Tenant's improvements, trade fixtures, decorations, signs, and contents in the Premises in a manner and to at least a condition equal to that existing prior to their damage or destruction, and the proceeds of all insurance carried by Tenant on said property shall be held in trust by Tenant for the purposes of such repair, restoration, or replacement.

If, by reason of such fire or other casualty, the Premises is rendered wholly untenantable, then the Rent payable by Tenant shall be fully abated, or if only partially damaged, such Rent and other, charges shall be abated proportionately as to that portion of the Premises rendered untenantable, in either event (unless the Lease is terminated as aforesaid) from the date of such casualty until the Premises have been substantially repaired and restored, or until Tenant's business operations are restored in the entire Premises, whichever shall first occur. Tenant shall continue the operation of Tenant's business in the Premises or any part thereof not so damaged during any such period to the extent reasonably practicable from the standpoint of prudent business management. However, if such damages or other casualty shall be caused by the negligence or other wrongful conduct of Tenant or of Tenant's subtenants, licensees, contractors, or invitees, or their respective agents or employees, there shall be no abatement of Rent. Except for the abatement of the Rent hereinabove set forth, Tenant shall not be entitled to, and hereby waives,

all claims against Landlord for any compensation or damage for loss of use of the whole or any part of the Premises and/or for any inconvenience or annoyance occasioned by any such damage, destruction, repair, or restoration, unless such damage is caused by the gross negligence or willful misconduct of Landlord.

8.    ASSIGNMENT - SUBLEASE. Tenant may not assign or encumber this Lease or its interest in the Premises arising under this Lease, and may not sublet any part or all of the Premises without first obtaining the written consent of Landlord, which consent shall not be unreasonably withheld or delayed. Any assignment or sublease to which Landlord may consent (one consent not being any basis that Landlord should grant any further consent) shall not relieve Tenant of any or all of its obligations hereunder. For the purpose of this Section 8, the word "assignment" shall be defined and deemed to include the following: (i) if Tenant is a partnership, the withdrawal or change, whether voluntary, involuntary, or by operation of law of partners owning thirty percent (30%) or more of the partnership, or the dissolution of the partnership; (ii) if Tenant consists of more than one person, an assignment, whether voluntary, involuntary, or by operation of law, by one person to one of the other persons that is a Tenant; (iii) if Tenant is a corporation, any dissolution or reorganization of Tenant, or the sale or other transfer of a controlling percentage (hereafter defined) of capital stock of Tenant other than an affiliate or subsidiary or the sale of fifty-one percent (51%) in value of the assets of Tenant; (iv) if Tenant is a limited liability company, the change of members whose interest in the company is fifty percent (50%) or more. The phrase "controlling percentage" means the ownership of, and the right to vote, stock possessing at least fifty-one percent (51%) of the total combined voting power of all classes of Tenant's capital stock issued, outstanding and entitled to vote for the election of directors, or such lesser percentage as is required to provide actual control over the affairs of the corporation. Acceptance of Rent by Landlord after any non-permitted assignment shall not constitute approval thereof by Landlord. Notwithstanding the foregoing provisions of this Section 8, Tenant may assign or sublease part or all of the Premises without Landlord's consent to: (i) any corporation or partnership that controls, is controlled by, or is under common control with, Tenant; or (ii) any corporation resulting from the merger or consolidation with Tenant or to any entity that acquires all of Tenant's assets as a going concern of the business that is being conducted on the Premises, as long as the, assignee or sublessee is a *bona fide* entity and assumes the obligations of Tenant, and continues the same use as permitted under Section 3. However, Landlord must be given prior written notice of any such assignment or subletting. Landlord will never consent to an assignment or sublease that might result in a use that conflicts with the rights of an existing Tenant under its lease.

In no event shall this Lease be assignable by operation of any law, and Tenant's rights hereunder may not become, and shall not be listed by Tenant as an asset under any bankruptcy, insolvency or reorganization proceedings. Tenant is not, may not become, and shall never represent itself to be an agent of Landlord, and Tenant acknowledges that Landlord's title is paramount, and that it can do nothing to affect or impair Landlord's title.

If Landlord consents to any assignment or subletting, Tenant shall pay all reasonable out-of-pocket costs and expenses incurred by Landlord in connection with the assignment or sublease transaction, including Landlord's reasonable attorney's fees.

If this Lease shall be assigned or the Premises or any portion thereof sublet by Tenant at a Rental that exceeds the Rentals to be paid to Landlord hereunder, attributable to the Premises or portion thereof so assigned or sublet, then any such excess shall be paid over to Landlord by Tenant. If Landlord assists Tenant in finding a permissible subtenant, Landlord shall be paid a fee for such assistance in addition to a fee in an amount necessary to cover the subtenant's improvements to the Premises.

9.    TENANT'S COMPLIANCE; INSURANCE REQUIREMENTS. Tenant shall comply with all applicable laws, ordinances and regulations affecting the Premises, now existing or hereafter adopted, including the Rules and Regulations.

Throughout the Term of this Lease, Tenant at its sole cost and expense shall keep or cause to be kept for the mutual benefit of Landlord, Landlord's managing agent, (presently CBRE, Inc. and its affiliates) and Tenant, Commercial General Liability Insurance (1986 ISO Form or its equivalent) providing minimum coverages of One Million ($1,000,000.00) Dollars combined single limit for bodily injury and property damage per occurrence, with Two Million ($2,000,000.00) Dollars aggregate coverage, which policy shall insure against liability of Tenant, arising out of and in connection with Tenant's use of the Premises, and which shall insure the indemnity provisions contained herein. Tenant shall also obtain an excess liability or umbrella policy in an amount not less than Two Million ($2,000,000.00) per occurrence. Not more frequently than once every three (3) years, Landlord may require the limits to be increased if in its reasonable judgment (or that of its mortgagee) the coverage is insufficient. Tenant shall also carry the equivalent of ISO Special form Property Insurance on its personal property and fixtures located in the Premises and any improvements made by Tenant for their full replacement value and with coinsurance waived, and Tenant shall neither have, nor make, any claim against Landlord for any loss or damage to the same, regardless of the cause thereof.

Prior to taking possession of the Premises, and annually thereafter, Tenant shall deliver to Landlord certificates or other evidence of insurance satisfactory to Landlord. All such policies shall be non-assessable and shall contain language to the extent obtainable that: (a) any loss shall be payable notwithstanding any act or negligence of Landlord or Tenant that might otherwise result in forfeiture of the insurance, (b) that the policies are primary and non-contributing with any insurance that Landlord may carry, and (c) that the policies cannot be cancelled, non-renewed, or coverage reduced except after thirty (30) days' prior written notice to Landlord. If Tenant fails to provide Landlord with such certificates or other evidence of insurance coverage, Landlord may obtain such coverage and Tenant shall reimburse the cost thereof on demand.

Anything in this Lease to the contrary notwithstanding, Landlord hereby releases and waives unto Tenant (including all partners, stockholders, officers, directors, employees and agents thereof), its successors and assigns, and Tenant hereby releases and waives unto Landlord (including all partners, stockholders, officers, directors, employees and agents thereof), its successors and assigns, all rights to claim damages for any injury, loss, cost or damage to persons or to the Premises or any other casualty, as long as the amount of which injury, loss, cost or damages has been paid either to Landlord, Tenant, or other person, firm or coiporation, under the terms of any Property, General Liability, or other policy of insurance, to the extent such releases or waivers are permitted under applicable law. As respects all policies of

insurance carried or maintained pursuant to this Lease and to the extent permitted under such policies Tenant and Landlord each waive the insurance carriers' rights of subrogation. Subject to the foregoing, Tenant shall indemnify and hold Landlord harmless from and against any and all claims arising out of (a) Tenant's use of the Premises or any part thereof, (b) any activity, work, or other thing done, permitted or suffered by Tenant in or about the Premises or the Building, or any part thereof, (c) any breach or default by Tenant in the performance of any of its obligations under this Lease, or (d) any act or negligence of Tenant, or any officer, agent, employee, contractor, servant, invitee or guest of Tenant; and in each case from and against any and all damages, losses, liabilities, lawsuits, costs and expenses (including attorneys' fees at all tribunal levels) arising in connection with any such claim or claims as described in (a) through (d) above, or any action brought thereon. If such action is brought against Landlord, Tenant, upon notice from Landlord, shall defend the same through counsel selected by Tenant's insurer, or other counsel acceptable to Landlord. Tenant assumes all risk of damage or loss to its property or injury or death to persons in, on, or about the Premises, from all causes except those for which the law imposes liability on Landlord regardless of any attempted waiver thereof, and Tenant hereby waives such claims in respect thereof against Landlord. Like and subject to the forgoing, Landlord hereby indemnifies and agrees to hold Tenant harmless from, and to defend Tenant against, any and all claims of liability for any injury (including death) or damage to any person or property whatsoever, other than that caused by the negligence or willful misconduct of Tenant, its agents, customers, invitees, servants, contractors and employees, occurring as a result of any act, neglect, fault or omission to act on the part of Landlord, its agents, contractors, employees, or invitees. The provisions of this paragraph shall survive the termination of this Lease.

Landlord shall keep the Building, including the improvements, insured against damage and destruction by perils, insured by the equivalent of ISO Special Form Property Insurance in the amount of the full replacement value of the Building.

Each party shall keep its personal property and trade fixtures in the Premises and Building insured with the equivalent of ISO Special Form Property Insurance in the amount of the frill replacement cost of the property and fixtures. Tenant shall also keep any non-standard improvements made to the Premises at Tenant's request insured to the same degree as Tenant's personal property.

All insurance policies required by this Lease shall: (a) be issued by insurance companies licensed to do business in the state in which the Premises are located with a general policyholder's ratings of at least A- and a financial rating of at least #VI in the most current Best's Insurance Reports available on the Commencement Date, or if the Best's ratings are changed or discontinued, the parties shall agree to a comparable method of rating insurance companies; (b) name the nonprocuring party as an additional insured as its interests may appear (other landlords or Tenants may be added as additional insureds in a blanket policy); (c) provide that the insurance not be cancelled, non-renewed or coverage materially reduced unless thirty (30) days' advance notice is given to the non-procuring party; (d) be primary policies; (e) provide that any loss shall be payable notwithstanding any gross negligence of Landlord or Tenant which might result in a forfeiture thereunder of such insurance or the amount of proceeds payable; (f) have no deductible exceeding $10,000, unless accepted in writing by

Landlord; and (g) be maintained during the entire Lease Term and any extension terms.

10.     SUBORDINATION-ATTORNMENT; LANDLORD FINANCING.

(a)     Tenant agrees that this Lease will be subordinate to any mortgage, deed of trust and/ or related security instruments (including without limitation any assignment of this Lease or rents hereunder) (hereinafter collectively referred to as the "Mortgage") heretofore or hereafter executed by Landlord covering the Premises, depending on the requirements of such mortgagee or beneficiary (hereinafter referred to as the "Mortgagee"). Tenant, within ten (10) days after request to do so from Landlord or its Mortgagee, will execute such agreement making this Lease superior or subordinate and containing such other agreements and covenants on Tenant's part as Landlord's Mortgagee may request, and will agree to attorn to said Mortgagee provided the Mortgagee agrees not to disturb Tenant's possession hereunder so long as Tenant is in compliance with this Lease. Further, Tenant agrees to execute, as often as requested, estoppel certificates in accordance with Section 24 of this Lease confirming any factual matter requested therein which is true and is within Tenant's knowledge regarding this Lease, the Premises, or Tenant's use thereof, including, but not limited to date of occupancy, Expiration Date, the amount of Rent due and date to which Rent is paid, whether or not Tenant has any defense or offsets to the enforcement of this Lease or the Rent payable hereunder or knowledge of any default or breach by Landlord, and that this Lease together with any modifications or amendments is in full force and effect. Tenant shall attach to such estoppel certificate copies of all modifications or amendments. Tenant agrees to give any Mortgagee of Landlord which has provided a non-disturbance agreement to Tenant, notice of, and a reasonable opportunity (which shall in no event be less than thirty (30) days after written notice thereof is delivered to Mortgagee as herein provided) to cure, any Landlord default hereunder; and Tenant agrees to accept such cure if effected by such Mortgagee. No termination of this Lease by Tenant shall be effective until such notice has been given and the cure period has expired without the default having been cured. Further, Tenant agrees to permit such Mortgagee (or other purchaser at any foreclosure sale), and its successors and assigns, on acquiring Landlord's interest in the Premises and the Lease, to become substitute Landlord hereunder, with liability only for such Landlord obligations as accrue after Landlord's interest is so acquired. Tenant agrees to attorn to any successor Landlord.

(b)     In the event of a foreclosure or transfer in lieu of a foreclosure, Tenant agrees that the purchaser at the foreclosure, or transferee (hereinafter referred to as the "New Owner"):

(i)     is relieved from the obligation to return any security deposit not actually received by the Mortgagee or the New Owner;

(ii)    shall not be bound by Rents paid more than one month in advance; and

(iii)   shall not be bound by actions taken by the Landlord with respect to this Lease not permitted under the terms of the Mortgage.

(c)    Tenant acknowledges that (i) Landlord owns all personal property affixed to the Real Property, other than trade fixtures, office furniture, office equipment or other personal property the use of which is not provided by the Landlord to the Tenant under the Lease, and (ii) Tenant is obligated to repair any damages incidental to the removal of trade fixtures, office furniture or office equipment owned by the Tenant.

(d)    Any notice delivered to the Tenant by the Mortgagee shall be valid if delivered to the Premises demised by this Lease.

11.    SIGNS. No later than the Commencement Date, Landlord shall provide, at Landlord's expense, listings for Tenant on the Building tenant directory located in the Building's main lobby.  Landlord shall maintain such Building tenant directory at all times during the Term of this Lease. Tenant, at Tenant's expense, shall be responsible for purchasing and installing (i) tenant's placard, (ii) wall sign at the entrance to the Premises stating Tenant's name, and (iii) if the Premises are located on the first floor of the Building the outside sign banner that features Tenant's logo (collectively, "Tenant Signage"). All Tenant Signage must be pre-approved in advance by Landlord.  Tenant shall maintain Tenant Signage in good condition throughout the Term and any renewal or extension thereof.  Upon the expiration of the Term, as same may be extended or renewed, or the earlier termination of this Lease, Tenant, at Tenant's expenses, shall remove all Tenant Signage and repair any damage caused by the installation or removal of the Tenant Signage.

12.    ACCESS TO PREMISES. Landlord shall have the right, at all reasonable times, either itself or through its authorized agents, to enter the Premises (i) to make repairs, alterations or changes as Landlord deems necessary, (ii) to inspect the Premises, and (iii) to show the Premises to prospective mortgagees and purchasers. Landlord shall have the right, either itself or through its authorized agents, to enter the Premises at all reasonable times and with reasonable notice for inspection to show prospective Tenants if within one hundred eighty (180) days of the Expiration Date as extended by any exercised option. Tenant, its agents, employees, invitees, and guests, shall have the right of ingress and egress to common and public areas of the Building, provided Landlord by reasonable regulation may control such access for the comfort, convenience, safety and protection of all tenants in the Building, or as needed for making repairs and alterations. Landlord shall have the right to further improve the Property, including changes to the site plan, provided such changes do not materially affect Tenant's ability to operate its business. Should Tenant desire to access the Premises after hours (defined as outside the hours of 8am-6pm), Tenant shall be responsible for providing such access to the Premises to its agents, employees, invitees and guests, but in no event shall Tenant's use of and access to the Premises after hours compromise the security of the Building. Any additional operating expenses which are attributable to after hours use shall be the responsibility of Tenant. Landlord shall have the right to enter the Premises at any time in the event of an emergency.

13.    DEFAULT. If Tenant: (i) fails to pay when due any Rent, or any other sum of money which Tenant is obligated to pay, as provided in this Lease within five (5) calendar days after the Landlord provides the Tenant with notice of nonpayment; or (ii) breaches any other agreement, covenant or obligation herein set forth and such breach shall continue and not be

17

remedied within fifteen (15) days after Landlord shall have given Tenant written notice specifying the breach, or if such breach cannot, with due diligence, be cured within said period of fifteen (15) days and Tenant does not within said fifteen (15) day period commence and thereafter with reasonable diligence completely cure the breach; or (iii) files or has filed against it and not stayed or vacated within sixty (60) days after filing) any petition or action for relief under any creditor's law (including bankruptcy, reorganization, or similar action), either in state or federal court; or (iv) makes any transfer in fraud of creditors as defined in Section 548 of the United States Bankruptcy Code (11 U.S.C. 548, as amended or replaced), (hereinafter referred to as the "BIC Code") has a receiver appointed for its assets (and appointment shall not have been stayed or vacated within thirty (30) days), or makes an assignment for benefit of creditors; then Tenant shall be in default hereunder, and, in addition to any other lawful right or remedy which it may have, Landlord at its option may do the following: (i) terminate this Lease; (ii) repossess the Premises, and with or without terminating, relet the same at such amount as Landlord deems reasonable; and if the amount for which the Premises is relet is less than Tenant's Rent and all other obligations of Tenant to Landlord hereunder, then Tenant shall immediately pay the difference on demand to Landlord, but if in excess of Tenant's Rent, and all other obligations of Tenant hereunder, the entire amount obtained from such reletting shall belong to Landlord, free of any claim of Tenant thereto; (iii) notwithstanding the termination of this Lease, declare the present value of all Rent which would have been due under this Lease for the balance of the Term or exercised renewal period to be immediately due and payable and collect the deficiency between such amount and the net amount, if any, of rents collected under any reletting of the Premises in any manner not inconsistent with applicable law; (iv) seize and hold any, personal property of Tenant located in the Premises and assert against the same a lien for monies due Landlord; or (v) without obtaining any court authorization, lock the Premises and deny Tenant access thereto. For the purposes of this Section 13, "present value" shall be computed by discounting the entire balance to present value at a discount rate equal to one (1) percentage point above the discount rate then in effect at the Federal Reserve Bank nearest the location of the Premises. All reasonable expenses of Landlord in repairing, restoring, or altering the Premises for reletting as general office space, together with leasing fees and all other expenses in seeking and obtaining a new Tenant, shall be charged to and be a liability of Tenant. Landlord's reasonable attorneys' fees in pursuing any of the foregoing remedies, or in collecting any Rent due by Tenant hereunder, shall be paid by Tenant.

All rights and remedies of Landlord are cumulative, and the exercise of any one shall not be an election excluding Landlord at any other time from exercise of a different or inconsistent remedy. No exercise by Landlord of any right or remedy granted herein shall constitute or effect a termination of this Lease unless Landlord shall so elect by written notice delivery to Tenant.

The failure of Landlord to exercise its rights in connection with this Lease or any breach or violation of any term, or any subsequent breach of the same or any other term, covenant or condition herein contained shall not be a waiver of such term, covenant or condition or any subsequent breach of the same or any other covenant or condition herein contained.

No acceptance by Landlord of a lesser sum than the Base Rent, administrative

charges, Additional Rent and other sums then due shall be deemed to be other than on account of the earliest installment of such payments due, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed as accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such installment or pursue any other remedy provided in this Lease.

In addition, no payments of money by Tenant to Landlord after the expiration or termination of this Lease after giving of any notice by Landlord to Tenant shall reinstate or extend the Lease Term, or make ineffective any notice given to Tenant prior to the payment of such money. After the service of notice or the commencement of a suit, or after final judgment granting Landlord possession of the Premises, Landlord may receive and collect any sums due under this Lease, and the payment thereof shall not make ineffective any notice or in any manner affect any pending suit or any judgment previously obtained.

Tenant further agrees that Landlord may obtain an order for summary ejectment from any court of competent jurisdiction without prejudice to Landlord's rights to otherwise collect Rents from Tenant.

14.    MULTIPLE DEFAULTS.

(a)    Tenant acknowledges that any rights or options of first refusal, or to extend the Lease Term, to expand the size of the Premises, or other such or similar rights or options which have been granted to Tenant under this Lease are conditioned upon the prompt and diligent performance of the terms of this Lease by Tenant. Accordingly, should Tenant default under this Lease on two (2) or more occasions during any twelve (12) month period, in addition to all other remedies available to Landlord, all such rights and options shall automatically, and without further action on the part of any party, expire and be deemed cancelled an of no further force and effect.

(b)    Should Tenant default in the payment of Base Rent, Additional Rent, or any other sums payable by Tenant under this Lease on two (2) or more occasions during any twelve (12) month period, regardless of whether any such default is cured, then, in addition to all other remedies otherwise available to Landlord, Tenant shall, within ten (10) days after demand by Landlord, post a security deposit in, or increase the existing Security Deposit by a sum equal to three (3) months' installments of Base Rent. Any security deposit posed pursuant to the foregoing sentence shall be governed by the Security Deposit section of this Lease.

(c)    Should Tenant default under this Lease on two (2) or more occasions during any twelve (12) month period, in addition to all other remedies available to Landlord, any cure periods otherwise set forth in this Lease with respect to a default by Tenant shall be reduced to ten (10) days.

15.    PROPERTY OF TENANT. Tenant shall pay timely any and all taxes levied or assessed against or upon Tenant's equipment, fixtures, furniture, leasehold improvements and personal property located in the Premises. Tenant (if not in default hereunder), prior to the Expiration Date of this Lease, may remove all possessions, furniture, fixtures, and equipment

4

SY

which it has placed in the Premises or Building, providing Tenant repairs all damages caused by such removal. Tenant acknowledges that it has an agreement with the Bank of Travelers Rest regarding lien subordination, which is attached hereto as <u>Exhibit G</u>. Landlord reserves the right to require Tenant to remove any improvements or additions made to the Premises by Tenant and to repair and restore the Premises to their condition prior to such alteration, addition or improvement, reasonable wear and tear, unrepaired casualty and condemnation excepted, unless Landlord has agreed at or prior to the time Tenant requests the right to make such alteration, addition or improvement that such item need not be removed by Tenant at the expiration or earlier termination of this Lease. Any statutory lien for Rent is not waived. If Tenant does not remove its property from the Premises upon termination (for whatever cause) of this Lease, such property shall be deemed abandoned by Tenant, and Landlord may dispose of the same in whatever manner Landlord may elect without any liability to Tenant.

16.    BANKRUPTCY. Landlord and Tenant understand that, notwithstanding certain provisions to the contrary contained herein, a trustee or debtor in possession under the BK Code may have certain rights to assume or assign this Lease. Landlord and Tenant further understand that, in any event, Landlord is entitled under the BK Code to adequate assurances of future performance of the provisions of this Lease. The parties agree that, with respect to any such assumption or assignment, the term "adequate assurance" shall include at least the following:

(a)    In order to assure Landlord that the proposed assignee will have the resources with which to pay all Rent payable pursuant to the provisions of this Lease, any proposed assignee must have, as demonstrated to Landlord's satisfaction, a net worth (as defined in accordance with generally accepted accounting principles consistently applied) of not less than the net worth of Tenant on the date of this Lease become effective, increased by seven percent (7%), compounded annually, for each year from the Commencement Date through the date of the proposed assignment. It is understood and agreed that the financial condition and resources of Tenant were a material inducement to Landlord in entering into this Lease.

(b)    Any proposed assignee must have been engaged in the conduct of business for the five (5) years prior to any such proposed assignment, which business does not violate the uses allowed under Section 3 of the Lease (\"<u>Permitted Uses</u>") and such proposed assignee shall continue to engage in the Permitted Uses. It is understood that Landlord's asset will be substantially impaired if the trustee in bankruptcy or any assignee of this Lease makes any use of the Premises other than the Permitted Uses.

(c)    Any proposed assignee of this Lease must assume and agree to be personally bound by the provisions of this Lease.

17.    EMINENT DOMAIN. If all of the Premises, or such part thereof as will make the same unusable for the purposes contemplated by this Lease, be taken under the power of eminent domain (or a conveyance in lieu thereof), then this Lease shall terminate as of the date possession is taken by the condemnor, and Rent shall be adjusted between Landlord and Tenant as of such date. If only a portion of the Premises is taken and Tenant can continue use of the remainder, then this Lease will not terminate, but Rent shall abate in a just and proportionate

20

amount to the loss of use occasioned by the taking. Landlord shall be entitled to receive and retain the entire award for the affected portion of the Building. Tenant shall have no right or claim to advance any claim against Landlord for any part of any award made to or received by Landlord for any talcing and no right or claim for any alleged value of the unexpired portion of this Lease, or its leasehold estate, or for costs of removal, relocation, business interruption expense or any other damages arising out of such taking, Tenant, however, shall not be prevented from making a claim against the condemning party (but not against Landlord) for any moving expenses, loss of profits, or taking of Tenant's personal property (other than its leasehold estate) to which Tenant may be entitled. Any such award shall not reduce the amount of the award otherwise payable to Landlord, if any.

18.    ADA GENERAL COMPLIANCE. Landlord and Tenant shall comply with all laws, rules, orders, ordinances, directions, regulations and requirements of federal, state, county and municipal authorities now in force, which shall impose any duty upon the Landlord or Tenant with respect to the use, occupation or alteration of Premises, and Landlord shall use all reasonable efforts to fully comply with The Americans With Disabilities Act of 1990. Landlord's responsibility for compliance with The Americans With Disabilities Act of 1990 shall be limited to the common areas and restrooms of the Building, as well as construction of the Property and Building in accordance with the Americans With Disabilities Act of 1990.

Within ten (10) days after receipt, Tenant shall advise Landlord in writing, and provide Landlord with copies of (as applicable), any notices alleging violation of The Americans With Disabilities Act of 1990 (hereinafter referred to as "ADA") relating to any portion of the Building or of the Premises; any claims made or threatened in writing regarding noncompliance with the ADA and relating to any portion of the Building or of the Premises; or any governmental or regulatory actions or investigations instituted or threatened regarding noncompliance with ADA and relating to any portion of the Building or the Premises. Landlord shall cure any ADA non-compliance with respect to the common areas and restrooms of the Building only.

19.    QUIET ENJOYMENT. If Tenant promptly and punctually complies with each of its obligations hereunder, it shall have and enjoy peacefully the possession of the Premises during the Term hereof, provided that no action of Landlord or other Tenants working in other space in the Building, or in repairing or restoring the Premises, shall be deemed a breach of this covenant, or give to Tenant any right to modify this Lease either as to term, Rent payables or other obligations to be performed.

20.    NOTICES. All notices, demands and requests which may be given or which are required to be given by either party to the other must be in writing. All notices, demands and requests by the Landlord or Tenant shall be addressed as follows (or to such other address as a party may specify by duly given notice):

RENT PAYMENT
ADDRESS          400 Augusta Street Investors, LLC
                 c/o **CBRE, INC.**
                 PO Box 1508

Greenville, South Carolina 29602

LEGAL
NOTICE
ADDRESS
FOR
LANDLORD:

**400 AUGUSTA STREET INVESTORS, LLC**
101 North Main Street
Suite 1400
Greenville, South Carolina 29601
Attention: Mr. Stephen Navarro

With a copy to:

**CBRE, INC.**
PO Box 1508
Greenville, South Carolina 29602
Attention: Asset Services

TENANT:

**UPSTATE CRAFT BEER, LLC**
400 Augusta Street, Suite 140
Greenville, South Carolina 29601

With a copy to:

Brook Bristow, Attorney
Bradford Neal Martin & Associates, PA
Post Office Box 10410
Greenville, South Carolina 29603

Notices, demands or requests which Landlord or Tenant are required to give the other hereunder shall be deemed to have been properly given for all purposes if (i) delivered against a written receipt of delivery, (ii) mailed by express, registered or certified mail of the United States Postal Service, return receipt requested, postage prepaid, or (iii) delivered to a nationally recognized overnight courier service for next business day delivery, to its addressee at such party's address as set forth above. Each such notice, demand or request shall be deemed to have been received upon the earlier of (i) actual receipt or refusal by the addressee, (ii) three business days after deposit thereof at any main or branch United States Post Office if sent in accordance with section (ii) above, or (iii) the next business day after deposit thereof with the courier if sent pursuant to section (iii) above. The parties shall notify the other of any change in address, which notification must be at least fifteen (15) days in advance of being effective. Notices may be given on behalf of any party by such party's legal counsel.

22

21.    ESTOPPEL CERTIFICATE. Tenant shall, within ten (10) days of the request by Landlord, execute, acknowledge and deliver to Landlord, any Mortgagee, prospective Mortgagee or any prospective purchaser or transferee of the Property, the Building, or both (as designated by Landlord), an Estoppel Certificate in recordable form, or in such other form as Landlord, Mortgagee, prospective Mortgagee or prospective purchaser may from time to time reasonably require, evidencing whether or not (a) this Lease is in full force and effect; (b) this Lease has been amended in any way; (c) Tenant has accepted and is occupying the Premises; (d) there are any existing defaults on the part of Landlord hereunder or defenses or offsets against the enforcement of this Lease to the knowledge of Tenant (specifying the nature of such defaults, defenses or offsets, if any); (e) the date to which Rent and other amounts due hereunder, if any, have been paid; and (f) any such other information as may be reasonably requested by Landlord, Mortgagee, prospective Mortgagee or prospective purchaser. Each certificate delivered pursuant to this Paragraph may be relied on by Landlord, any prospective purchaser or transferee of Landlord's interest hereunder, or any Mortgagee or prospective Mortgagee. If Tenant fails to return such estoppel certificate to Landlord within 10 days after Landlord's request, Tenant shall be in default under this Lease, and at Landlord's election, Tenant shall be deemed to have approved all matters set forth in the estoppel certificate.

22.    HOLDING OVER. If Tenant shall hold over after the expiration of the Lease Term or other termination of this Lease, such holding over shall not be deemed to be a renewal of this Lease but shall be deemed to create a tenancy-at-sufferance and by such holding over Tenant shall continue to be bound by all of the terms and conditions of this Lease, except that during such tenancy-at-sufferance Tenant shall pay to Landlord (A) Rent at the rate equal to one hundred and fifty percent (150%) of that provided for in the foregoing Section 4, as such Rental amount may have been increased in accordance with the terms of Section 4 hereof, and (B) any and all operating expenses and other forms of Additional Rent payable under this Lease. The increased Rent during such holding over is intended to compensate Landlord partially for losses, damages and expenses, including frustrating and delaying Landlord's ability to secure a replacement Tenant.

23.    BROKER'S COMMISSIONS. Tenant represents and warrants that it has not dealt with any real estate broker, finder or other person, with respect to this Lease in any manner except CBRE, Inc ("Landlord's Broker") and Spencer / Hines Properties ("Tenant's Broker"). Landlord shall pay only any commissions or fees that are payable to the above-named brokers or finders with respect to this Lease pursuant to Landlord's separate agreement with such brokers. Tenant shall indemnify and hold Landlord harmless from any and all damages resulting from claims that may be asserted against Landlord by any other broker, finder or other person (including, without limitation, any substitute or replacement broker claiming to have been engaged by Tenant in the future), claiming to have dealt with Tenant in connection with this Lease or any amendment or extension hereto, or which may result in Tenant leasing other or enlarged space from Landlord. Landlord shall indemnify and hold Tenant harmless from any and all damages resulting from claims that may be asserted against Tenant by any other broker, finder or other person (including, without limitation, any substitute or replacement broker claiming to have been engaged by Landlord in the future), claiming to have dealt with Landlord in connection with this Lease or any amendment or extension hereto. The provisions of this paragraph shall survive the termination of this Lease.

24.    ENVIRONMENTAL COMPLIANCE.

(a)    Tenant's Responsibility. Tenant shall not (either with or without negligence) cause or permit the escape, disposal or release of any biologically active or other hazardous substances, or materials. Tenant shall not allow the storage or use of such substances or materials in any manner not sanctioned by law or in compliance with the highest standards prevailing in the industry for the storage and use of such substances or materials, nor allow to be brought into the Building in which the Premises are any such materials or substances except to use in the ordinary course of Tenant's business, and then only after written notice is given to Landlord of the identity of such substances or materials. Tenant covenants and agrees that the Premises will at all times during its use or occupancy thereof be kept and maintained so as to comply with all now-existing or hereafter enacted or issued statutes, laws, rules, ordinances, orders, permits and regulations of all state, federal, local and other governmental and regulatory authorities, agencies and bodies applicable to the Premises, pertaining to environmental matters or regulating, prohibiting or otherwise having to do with asbestos and all other toxic, radioactive, or hazardous wastes or material including, but not limited to, the Federal Clean Air Act, the Federal Water Pollution Control Act, and the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as from time to time amended (all hereinafter collectively called "Laws"). Tenant shall execute affidavits, representations and the like, from time to time, at Landlord's request, concerning Tenant's best knowledge and belief regarding the presence of hazardous substances or materials on the Premises.

(b)    Tenant's Liability. Tenant shall hold Landlord free, harmless, and indemnified from any penalty, fine, claim, demand, liability, cost or charge whatsoever which Landlord shall incur, or which Landlord would otherwise incur, by reason of Tenant's failure to comply with this Section 24 including, but not limited to: (a) the cost of bringing the Premises into compliance with all Laws and in a non-contaminated state, the same condition as prior to occupancy; (2) the reasonable cost of all appropriate tests and examinations of the Premises to confirm that the Premises have been brought into compliance with all Laws; and (3) the reasonable fees and expenses of Landlord's attorneys, engineers, and consultants incurred by Landlord in enforcing and confirming compliance with this Section 24.

(c)    Property. For the purposes of this Section 24, the Premises shall include the real estate covered by this Lease; all improvements thereon; all personal property used in connection with the Premises (including that owed by Tenant); and the soil, ground water, and surface water of the Premises, if the Premises include any ground area.

(d)    Inspections by Landlord. Landlord and its engineers, technicians, and consultants (hereinafter collectively referred to as the "Auditors") may, from time to time as Landlord deems appropriate, conduct periodic tests and examinations (hereinafter referred to as "Audits") of the Premises to confirm and monitor Tenant's compliance with this Section 24. Such audits shall be conducted in such a manner as to minimize the interference with Tenant's permitted activities on the Premises; however, in all cases, the Audits shall be of such nature and scope as shall be reasonably required by then existing technology to confirm Tenant's compliance with this Section 24. Tenant shall fully cooperate with Landlord and its Auditors in the conduct of such Audits. The costs of such Audits shall be paid by Landlord unless an Audit

24

shall disclose a material failure of Tenant to comply with this Section 24, in which case, the cost of such Audit, and the cost of all subsequent Audits made during the lease Term and within thirty (30) days thereafter (not to exceed two (2) such Audits per calendar year), shall be paid for on demand by Tenant.

(e)    Landlord's Liability. Provided, however, the foregoing covenants and undertakings of Tenant contained in this Section 24 shall not apply to any condition or matter constituting a violation of any Law: (1) which existed prior to the commencement of Tenant's use or occupancy of the Premises; (2) which was not caused, in whole or in part, by Tenant or Tenant's agents, employees, officers, partners, contractors or invitees; or (3) to the extent such violation is caused by, or results from the acts or neglects of Landlord or Landlord's agents, employees, officers, partners, contractors, guests, or invitees. Landlord shall hold Tenant free, harmless, and indemnified from any penalty, fine, claim, demand, liability, cost or charge whatsoever which Tenant shall incur, or which Tenant would otherwise incur, by reason of Landlord's failure to comply with this Section 24 including, but not limited to: (a) the cost of bringing the Premises into compliance with all Laws and in a non-contaminated state, the same condition as prior to occupancy; (2) the reasonable cost of all appropriate tests and examinations of the Premises to confirm that the Premises have been brought into compliance with all Laws; and (3) the reasonable fees and expenses of Tenant's attorneys, engineers, and consultants incurred by Tenant's in enforcing and confirming compliance with this Section 24.

(f)    Tenant's Liability After Termination of Lease. The covenants contained in this Section 24 shall survive the expiration or termination of this Lease, and shall continue for so long as Landlord and its successors and assigns may be subject to any expense, liability, charge, penalty, or obligation against which Tenant has agreed to indemnify Landlord under this Section 24 but in no event shall such survival period exceed three (3) years after the date Landlord discovers any breach of Tenant's obligations under this Section 24. Notwithstanding the foregoing provisions of this Section 24 shall not be deemed to limit any rights and remedies of Landlord at law and in equity. Upon prior written notice given by either Landlord or Tenant to the other party, a walkthrough will be conducted within thirty (30) days of Tenant vacating the Premises in an effort to try and identify and address any issues with respect to the covenants contained in this Section 24.

25.    MOLD. Because mold spores are present essentially everywhere and mold can grow in almost any moist location, Tenant acknowledges the necessity of adopting and enforcing good housekeeping practices, ventilation and vigilant moisture control within the Premises (particularly in kitchen areas, janitorial closets, bathrooms, in and around water fountains and other plumbing facilities and fixtures, break rooms, in and around outside walls, and in and around HVAC systems, and associated drains) for the prevention of mold (such measures, "Mold Prevention Practices"). Tenant will, at its sole cost and expense, keep and maintain the Premises in good order and condition in accordance with the Mold Prevention Practices and acknowledges that the control of moisture, and prevention of mold within the Premises, is integral to its obligations under this Lease.

Tenant, at its sole cost and expense, shall:

(a)    Regularly monitor the Premises for the presence of mold and any

25

conditions that reasonably can be expected to give rise or be attributed to mold or fungus including, but not limited to, observed or suspected instances of water damage, condensation, seepage, leaks or any other water penetration (from any source, internal or external,) mold growth, mildew, repeated complaints of respiratory ailments or eye irritation by Tenant's employees or any other occupants of the Premises, or any notice from a governmental agency of complaints regarding the indoor air quality at the Premises (the "Mold Conditions");

(b)    Immediately notify Landlord in writing if Tenant or its employees or agents observe, suspect, or have reason to believe mold or Mold Conditions exist at the Premises. In the event of suspected mold or Mold Conditions at the Premises, Landlord may cause an inspection of the Premises to be conducted, during such times as Landlord may designate, to determine if mold or Mold Conditions are present at the Premises; and

(c)    Remedy any mold or Mold Conditions present at the Premises if such conditions develop and if such conditions are a result of Tenant's or its agents or employees' negligence. Tenant hereby releases and relieves Landlord from any and all liability for bodily injury or damage to property and hereby waives any and all claims against Landlord related to or allegedly caused by or associated with any mold and Mold Conditions in or on the Premises resulting from Tenant's or its agents' or employees' acts or omissions.

Landlord, at its sole cost and expense, shall remedy any known mold or known Mold Conditions present at the Premises if such conditions develop and if such conditions are not a result of Tenant's or its agents' or employees' acts or omissions. Landlord hereby releases and relieves Tenant from any and all liability for bodily injury or damage to property and hereby waives any and all claims against Tenant related to or allegedly caused by or associated with any mold and Mold Conditions in or on the Premises unless such mold or Mold Condition are the result of Tenant's or its agents' or employees' acts or omissions.

The provisions of this Section shall survive the expiration or earlier termination of this Lease.

26.    LEED CERTIFICATION. If the Building is certified under the U.S. Green Building Council's Leadership in Energy and Environmental Design ("LEED") rating system for New Construction and Major Renovation at the Certified Level ("LEED Certification"), all costs associated with maintaining, managing, reporting, and re-commissioning the Building or any part thereof that was designed and/or built to be sustainable and conform to the LEED rating system and all costs associated with applying, reporting, and commissioning the Building or any part thereof to seek re-certification under the LEED rating system shall be Operating Expenses as defined in Section 4.2 of this Lease. Tenant shall not be responsible for having its Tenant's business operations or Premises LEED certified.

27.    ARTS PROGRAM. As the former Claussen Bakery, the Building is important to the fabric of the community, and Landlord intends to utilize the Building and Property to showcase the history and stories of the Building and the surrounding communities through artwork. Upon request of Landlord, Tenant agrees to seek out and sponsor a local artist's or artists' work by displaying such local artist's or artists' work within the Premises during normal business hours for viewing by the public. Tenant shall have discretion in choosing the

26

local artist or artists to display on the Premises. For each artist it sponsors, Tenant agrees to display a building standard placard to recognize the artist and the piece.

28.    NEW MARKETS TAX CREDIT REQUIREMENTS. Pursuant to the terms of a Performance Agreement, Landlord is obligated to provide certain information to its lender regarding employment opportunities created by Landlord and its tenants. As a condition of this Lease, Tenant agrees to provide the following information to Landlord, at least annually, in the form requested by Landlord's lender: (a) number of full-time equivalent employees and number of part-time equivalent employees; (b) total amount of wages and salaries paid; (c) description of employee benefits provided; (d) description of job training and advancement opportunities provided; (e) home addresses of all employees; and (f) such other information reasonably requested by Landlord's lender in connection with responding to any request by the Community Development Financial Institutions Fund or the U.S. Department of Treasury. As a service to the adjacent communities, Tenant shall also use commercially reasonable efforts to recruit and hire low-income persons and/or low income community residents, including sharing marketing information for job openings through the nearby neighborhood associations (Payne Logan, Sterling, Green Avenue, Greater Sullivan and Haynie-Sirrine), and Tenant shall submit to Landlord written documentation on an annual basis indicating that Tenant has used such commercially reasonable efforts regarding the recruitment and hiring of low-income persons and/or low income community residents.

Notwithstanding the foregoing, if Tenant views all or part of the above information to be confidential, then Tenant may elect to provide such confidential information directly to Landlord's lender, in which case Tenant shall notify Landlord of its election to send such information directly to Landlord's lender within five (5) days of any request for such information by Landlord and shall bear the responsibility of timely submitting such information to Landlord's lender and ensuring that such information was received by Landlord's lender.

Notwithstanding anything to the contrary that may be contained herein, Tenant will not (whether directly by Tenant or through any subtenant or assignee) suffer or permit the use of any portion of the Premises (a) as residential rental property as defined in §168(e)(2)(A) of the Internal Revenue Code of 1986, as amended (the "IRS Code"), (b) for the operation of any private or commercial golf course, country club, massage parlor, hot tub facility, suntan facility, racetrack or other facility used for gambling, (c) as a store the principal business of which is the sale of alcoholic beverages for consumption off the premises, or (d) for the development or holding of intangibles for sale or license or farming, including without limitation those activities described in §2032A(e)(5)(A) and (B) of the IRS Code (collectively, the "Tenant Excluded Uses"). Tenant understands and agrees that any violation of this section shall constitute a default under the Lease and shall be grounds for immediate termination of the Lease, and Tenant shall have no right to cure such default notwithstanding any other provision of this Lease.

Tenant shall deliver to Landlord a completed Gross Revenue Certificate in the form attached hereto Exhibit F (the "Gross Revenue Certificate") within (i) twenty (20) calendar days of the end of each June and December starting in 2016 and continuing throughout the

27

Term and (ii) at any time Tenant reasonably believes that the answer to either question 1 or 2 in the Gross Revenue Certificate exceeds twenty percent (20%). Tenant's failure to deliver a Gross Revenue Certificate (including the balance and income sheet contemplated therein) when due shall constitute a default under this Lease. Additionally, if Tenant's operations in the Premises as reflected in a submitted Gross Revenue Certificate indicate that Tenant in violation of any of the Tenant Excluded Uses or Landlord has other evidence that Tenant is in violation of any of the Tenant Excluded Uses, such violation shall constitute a default under this Lease, and in such event, without limiting any of Landlord's right or remedies under this Lease, Landlord shall have the right to terminate this Lease and/or terminate Tenant's right to possession of the Premises and notwithstanding any other provision of this Lease in the event of such default Tenant shall have no right to cure such default, and Landlord may immediately exercises its termination right at any time upon and after the occurrence of such a default. Moreover, if Tenant violates any of the Tenant Excluded Uses, Tenant shall indemnify Landlord for all damages, claims, liabilities and costs (including reasonable attorneys fees) incurred by Landlord in connection with such a violation including any amounts paid by Landlord related to such a violation in connection with any New Market Tax Credit financing agreements to which Landlord is a party.

29.    MISCELLANEOUS. Headings of sections are for convenience only and shall not be considered in construing the meaning of the contents of such paragraph. The invalidity of any portion of this Lease shall not have any effect on the balance hereof. Should Landlord institute any legal proceedings against Tenant for breach of any provision herein contained, and prevail in such action, Tenant shall be liable for the costs and expenses of Landlord, including its reasonable attorneys' fees (at all tribunal levels). This agreement shall be binding upon the respective parties hereto, and upon their heirs, executors, successors and assigns. This agreement supersedes and cancels all prior negotiations between the parties, and no changes shall be effective unless in writing signed by both parties. Tenant acknowledges and agrees that it has not relied upon any statements, representations, agreements or warranties except those expressed in this Lease, and that this Lease contains the entire agreement of the parties hereto with respect to the subject matter hereof. Landlord may sell the Premises or the Building without affecting the obligations of Tenant hereunder; upon the sale of the Premises or the Building, Landlord shall be relieved of all responsibility for the Premises and shall be released from any liability thereafter accruing under this Lease. If any Security Deposit or prepaid Rent has been paid by Tenant, Landlord may transfer the Security Deposit or prepaid Rent to Landlord's successor and upon such transfer, Landlord shall be released from any liability for return of Security Deposit or prepaid Rent. This Lease may not be recorded without Landlord's prior written consent, but Tenant agrees on request of Landlord to execute a memorandum hereof for recording purposes. The singular shall include the plural, and the masculine, feminine or neuter includes the other. If Landlord, or its employees, officers, directors, stockholders or partners are ordered to pay Tenant a money judgment because of Landlord's default under this Lease, said money judgment may only be enforced against and satisfied out of (i) Landlord's interest in the Building in which the Premises are located including the Rental income and proceeds from sale; and (ii) any insurance or condemnation proceeds received because of damage or condemnation to, or of, said Building that are available for use by Landlord. No other assets of Landlord or said other parties exculpated by the preceding sentence shall be liable for, or subject to, any such money judgment. This Lease shall be

28

interpreted and enforced in accordance with the laws of the State of South Carolina. If requested by Landlord, Tenant shall furnish appropriate legal documentation evidencing the valid existence in good standing of Tenant and the authority of any person signing this Lease to act for the Tenant. If Tenant signs as a corporation, each of the persons executing this Lease on behalf of Tenant does hereby covenant and warrant that Tenant is a duly authorized and existing corporation, that Tenant has and is qualified to do business in the State of South Carolina, that the corporation has a foil right and authority to enter into this Lease and that each of the persons signing on behalf of the corporation is authorized to do so. The submission of this Lease to Tenant for review does not constitute a reservation of or option for the Premises, and this Lease shall become effective as a contract only upon the execution and delivery by both Landlord and Tenant. The date of execution shall be entered on the top of the first page of this Lease by Landlord, and shall be the date on which the last party signed the Lease, or as otherwise may be specifically agreed by both parties. Such date, once inserted, shall be established as the final day of ratification by all parties to this Lease, and shall be the date for use throughout this Lease as the "Effective Date".

30.    RENEWAL PERIOD. Provided Tenant is not then in default in the performance of any term or condition of this Lease, Tenant shall have the option to renew this Lease for up to two periods. The first period commencing on the day immediately following the Expiration Date, and ending forty-eight (48) months thereafter (the "First Renewal Period"). The Base Rent in the First Renewal Period will have continual increases of three percent (3%) annually. The Second Renewal Period (the "Second Renewal Period"), if used, shall commence on the day immediately following the last day of the First Renewal Period, and ending forty-eight (48) months thereafter. The Base Rent in the Second Renewal Period will be the fair market value as determined below but in no event shall the Base Rent in the Second Renewal Period be less than the Base Rent for the last year of the First Renewal Period.

Either Renewal Period shall be exercisable by Tenant giving written notice to Landlord in accordance with this Lease of its intention to exercise the Renewal Period at least two hundred seventy (270) days prior to expiration of the initial Term with respect to the First Renewal Period and at least two hundred seventy (270) days prior to expiration of the First Renewal Period with respect to the Second Renewal Period (the "Renewal Period Notice"). In the event Tenant shall exercise its right to extend the Term for either or both the Renewal Periods, the terms and conditions of this Lease shall be applicable to each Renewal Period; provided, however, (i) the Base Rent payable during the First Renewal Period shall be based upon continual three percent (3%) annual increases and (ii) the Base Rent for the Second Renewal Period shall be the fair market value determined as follows: Landlord shall deliver in writing to Tenant the fair market value Base Rent ("Second Renewal Period Rent Notice") within thirty (30) days of receipt of the Renewal Period Notice. Landlord's selection of the Base Rent shall be based on rental rates being offered in the Building or in the market area surrounding the Buildng for similar space to the Premises. In the event that Tenant does not agree with the rent contained in the Second Renewal Period Rent Notice, Tenant may send to Landlord a written notice of objection within fifteen (15) days after Tenant's receipt of the Second Renewal Period Rent Notice. Upon receipt of such Tenant objection notice, Landlord and Tenant shall have a period of forty-five (45) days to mutually agree upon the Base Rent for the Second Renewal Period, and if Landlord and Tenant reach agreement on the Base Rent for

the Second Renewal Period, Landlord and Tenant shall enter into a lease amendemnt to reflect such agreeement.  If after said forty-five day negotiation period, Landlord and Teanant have not agreed upon the Base Rent for the Second Renewal Period, Tenant shall have the right to rescind its Renewal Period Notice within ten (10) days after the expiration of the 45-day negotiation period.  If Tenant does not send a notice of objection within the initial 15 day period, the Base Rent for the Second Renewal Period shall be the Base Rent set forth in the Second Renewal Period Rent Notice.  If (i) Tenant does send a notice of objection during said 15-day period, (ii) Landlord and Tenant do not reach an agreement on Base Rent during the 45-day negotiation period and (iii) Tenant does not rescind its Renewal Period Notice within 10 days after the expiration of the 45-day negotiation period, the Base Rent for the Second Renewal Period shall be the Base Rent set forth in the Second Renewal Period Rent Notice.

      31.    FIRST RIGHT OF REFUSAL.  Tenant shall have a right of first refusal to lease the adjacent space (space B) located on the first (1st) floor of the Building (the "First Refusal Space").  Tenant's first refusal rights relative to the First Refusal Space are subject to the following terms and conditions:

      (a)    Offer by Landlord.  If Landlord receives a written bona fide offer or proposal from a prospective tenant for the lease of part or all of the First Refusal Space (which may be in the form of a non-binding "letter of intent" or similar document), prior to entering into any lease with such prospective tenant, Landlord shall notify Tenant of the prospective lease (and of Landlord's receipt from the prospective tenant of a written offer or proposal relating thereto which is acceptable to Landlord) and such notification from Landlord to Tenant also shall identify all of the space to be leased, the effective rent commencement date, the term of the proposed lease, the rental rate, the terms of any options to renew or expansion rights and all other material economic terms and conditions provided for in the third party's offer or proposal.  Provided, however, Landlord shall not be required to notify Tenant of the identity of the prospective tenant.  Tenant shall have five (5) business days after such notification is delivered to Tenant by Landlord to elect (by so notifying Landlord in writing) to lease all (but not less than all) of the space encompassed by the prospective tenant's offer or proposal on all of the same terms and conditions (including, without limitation, rental rate, tenant improvements allowance and term of lease) as set forth in the prospective tenant's offer or proposal.

      (b)    Tenant's Election of Rights.  If Tenant elects pursuant to Section (a) above to lease from Landlord all of the space encompassed by the prospective tenant's offer or proposal, Tenant and Landlord shall proceed diligently and in good faith to finalize and execute a lease agreement for such purpose within fifteen (15) days after the expiration of the foregoing five (5) business day period (provided, however, in any event, Tenant's exercise of its rights relative to the First Refusal Space shall be irrevocable, and the terms set forth in the prospective tenant's offer or proposal shall be binding on Tenant).

      (c)    Tenant's Failure to Exercise Rights.  If Tenant elects not to lease from Landlord the space encompassed by a prospective tenant's offer or proposal (as evidenced either by Tenant's written notice to Landlord to that effect or by Tenant's failure to respond to Landlord within the five (5) business day period referenced in Section (a) above), then, in such

event, Landlord shall be entitled to enter into a lease agreement with the prospective tenant or any other party relative to all or any portion of the space encompassed by the prospective tenant's offer or proposal, in which case all of Tenant's rights under this <u>Section</u> shall immediately and automatically terminate relative to such portion or all (as the case may be) of the First Refusal Space that Landlord so leases for a period of seven (7) months (following which period Tenant's rights set forth in this <u>Section</u> shall be re-instated).

(d)    <u>Condition to Exercise</u>.  Notwithstanding any term or provision herein or in the Lease to the contrary, in no event shall Tenant be entitled to exercise its right of first refusal pursuant to this <u>Section</u> if (i) Tenant is then in default under the terms of the Lease beyond any applicable grace or cure period afforded to Tenant under the terms of the Lease, (ii) Tenant has then assigned this Lease or sublet the Premises or any portion thereof to an unaffiliated entity which is otherwise effectuated in accordance with this Lease or (iii) Tenant is not then occupying the Premises.

(e)    <u>Superior Rights</u>.  All rights of Tenant under this <u>Section</u> are subject and subordinate to all prior rights previously granted by Landlord to other tenants in the Building and shall further not be triggered by any tenant's renewal or extension of its lease term.

32.    ANTI-TERRORISM CERTIFICATION.    Tenant represents and warrants to Landlord throughout the Term that (a) Tenant and to the best of Tenant's knowledge any of Tenant's owners, members, management, employees, agents, contractors, licensees and invitees are not listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Asset Control Department of the Treasury ("OFAC") pursuant to the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) (the "Order") or on any other lists of terrorist or terrorist organizations ("Lists") issued pursuant to the rules and regulations of OFAC or in any other enabling legislation or other Executive Orders in respect thereof (the Order and such other rules, regulations legislation or orders are collectively called the "Orders"); (b) Tenant is not and will not be engaged in any activities prohibited in the Orders; (c) Tenant has not been convicted of or pleaded nolo contendere to charges related to activity prohibited in the Orders; and (d) Tenant will not permit the Premises to be used for activities prohibited in the Orders nor permit the Premises to be occupied by any person on such Lists.  Breach of any of these representations and warranties constitutes a material breach of the Lease, as amended hereby, and shall entitle Landlord to any and all remedies allowed by law.

[SIGNATURES BEGIN ON NEXT PAGE]

31

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease under seal in four originals, all as of the day and year first above written

IN THE PRESENCE OF:

LANDLORD:

**400 AUGUSTA STREET INVESTORS, LLC**

By: _____

Stephen P. Navarro, Manager

_____
First Witness

_Jennifer Boland_
Second Witness

(L.S.)

TENANT:

**UPSTATE CRAFT BEER, LLC**

By: _____
Name: Jack McDonald
Title: Owner / Officer

_____
First Witness

_William Craft_
Second Witness

(L.S.)

sF' y

## EXHIBIT A

The Premises

Attached or to be attached

33

<u>EXHIBIT A-1</u>

Depiction of Outdoor Seating Area

Attached or to be attached

## EXHIBIT B

### Legal Description of Property

PARCEL 1:

ALL that certain piece, parcel or lot of land situate, lying and being on the western side of Augusta Street in the City of Greenville, County of Greenville, State of South Carolina, being shown and designated as 2.51 Acres on ALTA/ACSM Land Title Survey for 400 Augusta Street Investors, LLC, prepared by Site Design, Inc., dated December 10, 2008, recorded in the Office of the Register of Deeds for Greenville County in Plat Book 1089 Page 46, and having such metes and bounds as appears thereon, incorporated herein by reference.

PARCEL 2:

ALL that certain lot, piece or parcel of land situate, lying and being in the State of South Carolina and  County of Greenville in the sixth Ward of the City of Greenville, having the following metes and bounds, to-wit: Beginning at a stake on the west side of Augusta Street, on the line of the right of way of Southern Railway Company (being 25 feet from the center of main track of Southern Railway), and running thence in a southerly direction along said Augusta Street, one hundred and sixteen (116) feet to an iron pin; thence at right angles in a westerly direction thirty-two feet (32) feet to right of way of  Southern Railway Company; thence along said right of way in a northerly or northeasterly direction one hundred and twenty-five (125) feet to the beginning corner.

THE ABOVE DESCRIBED PARCELS 1 AND 2 ALSO BEING DESCRIBED ACCORDING TO A MORE RECENT SURVEY AS FOLLOWS:

ALL that certain piece, parcel or lot of land situate, lying and being on the western side of Augusta Street in the City of Greenville, County of Greenville, State of South Carolina, being shown and designated as Tract 1 containing 2.51 acres and Tract 2 containing 0.03 acres on survey entitled "RECOMBINATION SURVEY FOR 400 AUGUSTA STREET INVESTORS, LLC", prepared by Site Design, Inc., dated 8-11-14 , recorded in the Office of the Register of Deeds for Greenville County in Plat Book 1192 Page 5, and having such metes and bounds as appears thereon, incorporated herein by reference.



EXHIBIT C

Work Letter

In consideration of the mutual covenants hereinafter contained, Landlord and Tenant do mutually agree to the following:

1.      Landlord shall, at its sole cost and expense, cause the Building and the Project to be constructed in accordance with Schedule 1 ("Landlord's Work"), which shall be attached to this Exhibit C pursuant to this paragraph. Landlord and Tenant have not yet agreed upon the plans and specifications to be included in Schedule 1 as Landlord's Work. Within the next thirty (30) days, Landlord and Tenant will finalize Schedule 1 in good faith. Upon their mutual agreement, Landlord and Tenant shall each initial the finalized Schedule 1, and such initialed Schedule 1 shall be deemed automatically incorporated herein. Landlord, at its reasonable discretion, may make changes to Landlord's Work during construction upon written notice to Tenant.

2.      Tenant shall, at its sole cost and expense, subject to Landlord's Contribution in Section 3 of this Exhibit C, provide the work in the Premises in accordance with Schedule 2 ("Tenant's Work"), which shall be attached to this Exhibit C pursuant to this paragraph. Landlord and Tenant have not yet agreed upon the plans and specifications to be included in Schedule 2 as Tenant's Work. Over the next thirty (30) days, Landlord and Tenant will finalize Schedule 2 in good faith. Upon their mutual agreement, Landlord and Tenant shall each initial the finalized Schedule 2, and such initialed Schedule 2 shall be deemed automatically incorporated herein.

3.      Landlord agrees to pay the cost of Tenant's Work up to, but not in excess of, seven and 50/100 Dollars ($7.50) per Usable Square Foot of space within the Premises ("Landlord's Contribution"). Tenant shall be responsible for and pay for all costs in connection with Tenant's Work in excess of seven and 50/100 Dollars ($7.50) per Usable Square Foot of space within the Premises. Landlord is entitled to review and approve the plans and specifications for Tenant's proposed alterations, which such approval shall not be unreasonably withheld, delayed or conditioned.

4.      Tenant, at its sole cost and expense, which expense may be funded out of the Landlord's Contribution, will cause to be prepared by a licensed architect and engineering firm the final working plans and specifications of Tenant's Work suitable for construction. Such final working plans and specifications and all changes to them during construction shall be subject to the reasonable approval of Landlord. As approved by Landlord, such final working plans and specifications are referred to as "Tenant's Plans."

5.      Workmanship and materials used in construction of Landlord's Work and Tenant's Work shall be of the highest quality. Tenant shall submit the name of its proposed general contractor and project manager for Landlord's prior approval, along with information on at least three (3) comparable projects completed by the contractor, if requested by Landlord and if the proposed contractors or subcontractors have not previously worked in the Building. Landlord hereby approves the general contractor and the structural, mechanical and electrical

36

Sf·A

contractors and subcontractors used by Landlord for the Project for Tenant's Work in those disciplines. If Tenant wishes to use different structural, mechanical or electrical contractors or subcontractors, Tenant shall submit the name of the proposed contractors or subcontractors and its project manager for Landlord's prior approval, along with information on at least three (3) comparable projects completed by the proposed contractors or subcontractors, if requested by Landlord and if the proposed contractors or subcontractors have not previously worked in the Building. Any contractors and/or subcontractors engaged by Tenant shall comply with all reasonable, nondiscriminatory rules and regulations as are established by Landlord and/or Landlord's general contractor to promote safety and quality of construction in the Building, and such contractors shall coordinate their efforts to ensure the timely completion of all Landlord's Work and Tenant's Work. All design, construction and installation for Landlord's Work and Tenant's Work shall conform to the requirements of the National Board of Fire Underwriters, all applicable building, plumbing and electrical codes and the requirements of all Governmental Authorities having jurisdiction over or with respect to Landlord's Work and Tenant's Work. Other than the approved final inspection by the County of Greenville for the Building shell and the common areas of the Building and Project to be secured by Landlord no later than the Delivery Date, Tenant or its contractors shall secure all necessary building and occupancy permits and/or approvals from all Governmental Authorities to allow Tenant to use and occupy the Premises and shall provide Landlord with copies of such permits. If said building and occupancy permits and/or approvals cannot be obtained due to the action or inaction on the part of Landlord, the Rental Commencement Date for each floor shall be extended for each day of delay caused by Landlord.

6.    Tenant agrees to indemnify Landlord, its agents, employees and contractors and to hold them harmless from and against any and all losses, costs, claims and liabilities of every kind and description which may arise out of or be connected in any way with the perfonnance of Tenant's Work and not caused or contributed to by the negligence or wrongdoing of Landlord, its employees, agents and contractors.

7.    On and after the date the Premises are available for Tenant's Work as provided in Section 1, Landlord shall permit Tenant and Tenant's duly authorized agents and Tenant's approved contractors and subcontractors to enter the Premises and to use the stairways and elevators in the Building at the same time that Landlord's contractors or any other contractors are working in the Building, in order that Tenant may install Tenant's Work, and otherwise adapt the Premises for Tenant's use. The foregoing license is conditioned upon Tenant's duly authorized agents and contractors working in harmony and not interfering with the labor employed by Landlord, by Landlord's mechanics or contractors, or by any other tenant or their agents or contractors, and complying with all rules and regulations established by Landlord and/or Landlord's general contractor to promote safety and quality of construction; failure of such compliance shall entitle Landlord to compel Tenant to use its best efforts to discharge the contractors or subcontractors who fail so to comply but shall not constitute revocation of the license granted herein. Such agents, contractors and mechanics shall coordinate their efforts to ensure timely completion of all work. This license is further conditioned upon the employment by the contractors or subcontractors engaged by Tenant of workers and means to ensure the progress of the work without interruption on account of strikes, work stoppage or similar causes for delay. Such license is further conditioned upon workers' compensation and public liability

insurance and property damage insurance, all in amounts and with companies and on forms reasonably satisfactory to Landlord, being provided and at all times maintained by Tenant's duly authorized agents and contractors engaged in the performance of such work, and certificates of such insurance being furnished to Landlord prior to proceeding with such work. The parking for Tenant's general contractor and its subcontractors and their employees shall not be the responsibility of Landlord.

8.      All plans and working drawings for the construction and completion of Tenant's Premises, shall be subject to Landlord's prior written approval. Any changes or modifications Tenant desires to make to such plans or working drawings shall also be subject to Landlord's prior approval. Landlord agrees that it will not unreasonably withhold its approval of the plans and working drawings for the construction of Tenant's Premises, or of any changes or modifications thereof; provided, however, the Landlord shall have sole and absolute discretion to approve or disapprove any improvements that will be visible to the exterior of the Premises, or which may affect the structural integrity of the Building. Any approval of such plans and working drawings by Landlord shall not constitute approval of any delays caused by Tenant and shall not be deemed a waiver of any rights or remedies that may arise as a result of such delays. Tenant shall not start any construction in the Premises until all of the following have been accomplished:  (a) Landlord has approved Tenant's Plans, (b) Landlord has approved Tenant's contractor and subcontractors, (c) Tenant has secured and furnished Landlord with copies of all building permits from the appropriate Governmental Authorities, (d) Tenant has furnished Landlord with certificates of insurance evidencing the policies of insurance required under this Lease and in the foregoing Section (6), and (e) Tenant's general contractor has acknowledged receipt of any rules and regulations established by Landlord and/or Landlord's general contractor. Tenant shall provide Landlord with copies of all building permits within ten (10) days of Tenant's receipt thereof.  Landlord shall approve or disapprove any Tenant Plans submitted by Tenant to Landlord, which approval shall not unreasonably withheld, by sending a written notice of approval or disapproval within ten (10) business days after Landlord's receipt of such plans.

9.      Tenant's Work shall proceed strictly in accordance with Tenant's Plans and the rules and regulations established by Landlord and/or Landlord's general contractor to promote safety and quality of construction in the Building.  Upon completion of Tenant's Work, Tenant shall deliver to Landlord one set of as-built plans for the Premises.  Landlord agrees to deliver to Tenant upon execution of this Lease or as soon as is practical thereafter, one set of plans and specifications for Landlord's Work in order that Tenant may cause the preparation of Tenant's Plans.

10.      If Tenant employs a general contractor other than Landlord's general contractor, such contractor will be required, before commencement of Tenant's Work, to waive any and all rights (if any) to file liens against Landlord or any part of the Project other than Tenant's leasehold estate in connection with the performance of Tenant's Work.

11.      Tenant's Work will be performed in accordance with Landlord's sustainability practices, including any third-party rating system concerning the environmental compliance of the Building or the Premises, as the same may change from time to time.

12.    If Landlord is required to manage the construction, Tenant shall pay to Landlord a construction management fee equal to five percent (5%) of the total cost of Landlord's Work and Tenant's Work.  Such fee shall be paid to Landlord or Landlord's designated agent, and may be funded out of Landlord's Contribution, to the extent available.  If Tenant self-perfonns the work, Tenant must submit (to be approved and not unreasonably withheld) the following:

- Copy of all permits with the City of Greenville
- Stamped architectural drawings
- All lein waiver forms
- Full proofs of insurance
- Certificate of Occupancy, where applicable

39

Schedule 1

Landlord's Work

Attached or to be attached per terms of Exhibit C

i.      Concrete floor in as-is condition.

ii.     Existing brick exposed front walls – as-is condition.

iii.    Remaining exterior walls not comprised of exposed brick conditions shall be sheet-rocked, primed and ready for tenant's paint.

iv.     Doors:
- glass door from main corridor ("Door #1")
- (1) exclusive glass door to patio side ("Door #2")

Door #1 wired for electronic entry to coordinate with main entry features; connectivity per door to be supplied by Tenant.

v.      Painted truss system (as existing)

vi.     HVAC mechanical system to come to a central space sufficient for open space working office environment (up to five tons)
- The core and shell work for the HVAC equipment includes installed, wired, running and blowing out into the open space (or a credit equivalent to be agreed upon by Landlord and Tenant), the ductwork for distribution is part of the up fit cost.

vii.    Electrical:
- The main panel breaker and those required for the HVAC equipment (which is to be installed as core and shell work) are only breakers provided. All other breakers are part of the up fit work.
- Outlets, perimeter wall electrical outlets placed by Landlord per code for open space environment
- Amperage load to cover normal office lighting and fire alarm

viii.   Plumbing line in flooring; to be accessed by Tenant

ix.     Drain line in flooring to be accessed by Tenant

x.      Fire Alarm:
- The Permit drawings show 4 devices as new devices to be tied to fire alarm system. Landlord has provided 2 devices in the space. General Contractor will add the additional fire alarm devices required and will relocate the existing devices per the layout on the Permit drawings. The cost for this work will be included in the up fit portion of the cost. The only electrical work included in the core portion is for the hook up of the HVAC equipment.

40

<u>Schedule 2</u>

Tenant's Work

Attached or to be attached per terms of <u>Exhibit C</u>

*5^ fr*

<u>EXHIBIT D</u>

Rules and Regulations

**1.      Access to Building.** On Saturdays, Sundays, legal holidays and weekdays between the hours of 6:00 p.m. and 7:00 a.m., access to the Building and/or to the halls, corridors, elevators or stairways in the Building may be restricted and access shall be gained by use of a key or electronic card to the outside doors of the Buildings. Landlord may from time to time establish security controls for the purpose of regulating access to the Building. Tenant shall be responsible for providing access to the Premises for its agents, employees, invitees and guests at times access is restricted, and shall comply with all such security regulations so established. Tenant shall be permitted to have full access to the Premises through the main entrance from the exterior.

**2.      Protecting Premises.** The last member of Tenant to leave the Premises shall close and securely lock all doors or other means of entry to the Premises and shut off all lights in the Premises.

**3.      Building Directories.** The directories for the Building in the form selected by Landlord shall be used exclusively for the display of the name and location of Tenants. Any additional names and/or name changes requested by Tenant to be displayed in the directories must be approved by Landlord and, if approved, will be provided at the sole expense of Tenant.

**4.      Large Articles.** Furniture, freight and other large or heavy articles may be brought into the Building only at times and in the manner designated by Landlord and always at Tenant's sole responsibility. All damage done to the Building, its furnishings, fixtures or equipment by moving or maintaining such furniture, freight or articles shall be repaired at Tenant's expense.

**5.      Signs.** Tenant shall not paint, display, inscribe, maintain or affix any sign, placard, picture, advertisement, name; notice, lettering or direction on any part of the outside or inside of the Building, or on any part of the inside of the Premises which can be seen from the outside of the Premises, without the written consent of Landlord, and then only such name or names or matter and in such color, size, style, character and material as shall be first approved by Landlord in writing. Landlord reserves the right to remove at Tenant's expense all matter other than that above-provided for without notice to Tenant.

**6.      Compliance with Laws.** Tenant shall comply with all applicable laws, ordinances, governmental orders or regulations and applicable orders or directions from any public office or body having jurisdiction, whether now existing or hereinafter enacted with respect to the Premises and the use or occupancy thereof. Tenant shall not make 'or permit any use of the Premises which directly or indirectly is forbidden by law, ordinance, governmental regulations or order or direction of applicable public authority, which may be dangerous to person or property or which may constitute a nuisance to other Tenants.

**7.      Hazardous Materials.** Tenant shall not use or permit to be brought into the Premises or the Building any flammable oils or fluids, or any explosive or other articles deemed hazardous to

42

A

persons or property other than for cleaning, sanitizing, and sterilization, as well as nitrogen, and carbon dioxide, or do or permit to be done any act or thing which will invalidate, or which, if brought in, would be in conflict with any insurance policy covering the Building or its operation, or the Premises, or any part of either, and will not do or permit to be done anything in or upon the Premises, or bring or keep anything therein, which shall not comply with all rules, orders, regulations or requirements of any organization, bureau, department or body having jurisdiction with respect thereto (and Tenant shall at all times comply with all such rules, orders, regulations or requirements), or which shall increase the rate of insurance on the Building, its appurtenances, contents or operation.

8.      **Defacing Premises and Overloading.** Tenant shall not place anything or allow anything to be placed in the Premises near the glass of any door, partition, wall or window, which may be unsightly from outside the Premises. Tenant shall not place or permit to be placed any article of any kind on any window ledge or on the exterior walls; blinds, shades, awnings or other forms of inside or outside window ventilators or similar devices shall not be placed in or about the outside windows in the Premises or install any floor coverings in the Premises or make, paint, cut or drill into, or in any way deface any part of the Premises or Building without in each instance obtaining the prior written consent of Landlord. Tenant's brewing equipment as well as merchandise shall be deemed acceptable to be placed near the glass. All placement shall be acceptable to Landlord. Tenant shall not overload any floor or part thereof in the Premises, or any facility in the Building or any public corridors or elevators therein by bringing in or removing any large or heavy articles and, if considered necessary by Landlord may require Tenant at its expense to supply whatever supplementary supports necessary to properly distribute the weight.

9.      **Obstruction of Public Areas.** Tenant shall not, whether temporarily, accidentally or otherwise, allow anything to remain in, place or store anything in, or obstruct in any way, any sidewalk, court, hall, passageway, entrance, or shipping area. Tenant shall lend its full cooperation to keep such areas free from all obstruction and in a clean and sightly condition, and move all supplies, furniture and equipment as soon as received directly to the Premises, and shall move all such items and waste (other than waste customarily removed by Building employees) that are at any time being taken from the Premises directly to the areas designated for disposal. All courts, passageways, entrances, exits, elevators, escalators, stairways, corridors, halls and roofs are not for the use of the general public and Landlord shall in all cases retain the right to control and prevent access thereto by all persons whose presence, in the judgment of Landlord, shall be prejudicial to the safety, character, reputation and interest of the Building and its Tenants; provided, however, that nothing herein contained shall be construed to prevent such access to persons with whom Tenant deals within the normal course of Tenant's business so long as such persons are not engaged in illegal activities.

10.     **Additional Locks.** Tenant shall receive, at no expense, from Landlord two (2) keys to the entrance/exit door(s) to the Premises and up to ten (10) access card for entry to the Building. Should Tenant desire additional keys or additional access cards Landlord shall charge Tenant a reasonable charge for any additional keys or additional access cards requested by Tenant. Tenant shall not attach, or permit to be attached, additional locks or similar devices to any door or window, change existing locks or the mechanism thereof, or make or permit to be made any keys

for any door other than those provided by Landlord unless the written consent of Landlord shall have first been obtained. Landlord shall charge Tenant a reasonable charge for any additional locks or any additional keys requested by Tenant. Upon termination of this Lease or of Tenant's possession, Tenant shall immediately surrender all keys to the Premises.

**11.     Communications or Utility Connections.** If Tenant desires signal, alarm or other utility or similar service connections installed or changed, then Tenant shall not install or change the same without the approval of Landlord, and then only under direction of Landlord and at Tenant's expense. Tenant <u>shall</u> not install in the Premises any equipment which requires a greater than normal amount of electrical current for the permitted used without the advance written consent of Landlord. Tenant shall ascertain from Landlord the maximum amount of load or demand for or use of electrical current which can safely be permitted in the Premises, talcing into account the capacity of the electric wiring in the Building and the Premises and the needs of other Tenants in the Building, and shall not in any event connect a greater load than that which is safe.

**12.     Service Requirements.** Service requirements of Tenant will be attended to only upon application at the office of CBRE, Inc. Employees of Landlord shall not perform, and Tenant shall not engage them to do any work outside of their duties unless specifically authorized by Landlord.

**13.     Restrooms.** The restrooms, toilets, urinals, vanities and the other apparatus shall not be used for any purpose other than that for which they were constructed, and no foreign substance of any kind whatsoever shall be thrown therein. The expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the Tenant whom, or whose employees or invitees shall have caused it. Tenant shall be responsible for making sure that restrooms are inspected and cleaned every night prior to closing. This includes all waste removal if not already completed by janitorial service.

**14.     Intoxication.** Landlord reserves the right to exclude or expel from the Building any person who, in the judgment of Landlord, is intoxicated, or under the influence of liquor or drugs, or who in any way violates any of the rules and regulations of the Building.

**15.     Nuisances and Certain Other Prohibited Uses.** Tenant shall not (a) install or operate any internal combustion engine, boiler, machinery, refrigerating, heating or air conditioning apparatus in or about the Premises; (b) engage in any mechanical business, or in any service in or about the Premises or Building, except those ordinarily embraced within the permitted use of the Premises specified in **Section 3**; (c) use the Premises for housing, lodging, or sleeping purposes; (d) prepare or warm food in the Premises or permit food to be brought into the Premises for consumption therein (heating coffee and individual lunches of employees excepted) except by express permission of Landlord; (e) place any radio, television, microwave, or any antennae on the roof or on or in any part of the inside or outside of the Building other than the inside of the Premises, or place a musical or sound-producing instrument or device inside or outside the Premises which may be heard outside the Premises; (f) use any power source for the operation of any equipment or device other than dry cell batteries or electricity; (g) operate any electrical device from which may emanate waves that could interfere with or impair radio or television broadcasting or reception from or in the Building or elsewhere; (h) bring or permit to be in the

44

Building any bicycle, other vehicle, dog (except in the company of a blind person), other animal or bird; (i) make or permit any objectionable noise or odor to emanate from the Premises; (j) disturb, harass, solicit or canvass any occupant of the Building; (k) do anything in or about the Premises which could be a nuisance or tend to injure the reputation of the Building; (i) allow any firearms in the Building or the Premises except as approved by Landlord in writing. The before mentioned nuisances and other certain prohibited uses notwithstanding, Landlord and Tenant agree that certain such nuisances and uses listed above, which are necessary to Tenant's operation as set forth in Section 3, and therefore, shall be deemed to be acceptable uses hereunder.

16.    In the event that any other tenant makes a complaint to Landlord based on Tenant's failure to maintain applicable codes and regulations of governing authorities, both indoors and outdoors, and Tenant fails to cure such improper maintenance and/or code violation within ten (10) days following Landlord's notice, Landlord shall have the right to revoke Tenant's use of the Outdoor Seating Area, along with access and hours of operation, upon five (5) days prior written notice to Tenant. **Solicitation.** Tenant shall not canvass other Tenants in the Building to solicit business or contributions and shall not exhibit, sell or offer to sell, use, Rent or exchange any products or services in or from the Premises unless ordinarily embraced within the Tenant's use of the Premises for which specific authority granted in the lease agreement.

17.    **Energy Conservation.** Tenant shall not waste electricity, water, heat or air conditioning and agrees to cooperate frilly with Landlord to insure the most effective operation of the Buildings heating and air conditioning and shall not allow the adjustment (except by Landlord's authorized Building personnel) of any controls. Tenant will be in control of its own HVAC system to the Premises.

18.    **Building Security.** At all times other than normal business hours the exterior Building doors and suite entry door(s) must be kept locked to assist in security. The janitorial service, upon completion of its duties, will lock all Building doors. Problems in the Building and suite security should be directed to Landlord at ██████ ████████.

19.    **Parking.** Parking is only in areas that are specifically designated for parking. There may be no vehicles in "no parking" zones or at curbs. Handicapped spaces are for handicapped persons and the Police Department will ticket unauthorized (unidentified) cars in handicapped spaces. Landlord reserves the right to remove vehicles that do not comply with the Lease or these Rules and Regulations and Tenant shall indemnify and hold harmless Landlord from its reasonable exercise of these rights with respect to the vehicles of Tenant and its employees, agents and invitees. Tenants of the Building shall not use the non-exclusive surface parking spaces for special events if such use will prevent other tenants of the Building from having access to their non-exclusive parking spaces in accordance with the Parking Standard.  Should a tenant of the Building desire to use more parking spaces than its non-exclusive parking spaces in accordance with the Parking Standard on a temporary basis for a special event, Tenant shall provide Landlord within at least seven (7) days prior written notice.  Upon receipt of such notice, Landlord shall use its reasonable efforts to try and address such a tenant's request for special event parking needs in a manner that does interfere with the parking rights of the other tenants of the Building.  Landlord makes no representation or warranty regarding whether Landlord can accommodate a tenant's request for special event parking, and any tenant requesting special event parking shall abide with

all directives of Landlord, Landlord's property manager and any hired parldng attendants (which hired parking attendants shall be at the sole cost of such a tenant). The initial Parldng Standard shall be 3.8 parking spaces per 1,000 Useable Square Feet of Space leased to a tenant.

**20.    Construction.** Tenant shall make no structural or interior alterations of the Premises. All structural and nonstractural alterations and modifications to the Premises shall be coordinated through Landlord as outlined in the Lease. Completed construction drawings of the requested changes are not be submitted to Landlord or its designated agent for pricing and construction supervision.

**21.    Communication Lines.** Any installation of communication lines on or in the Building of any type (e.g. phone / internet / data / etc) utilized by Tenant must be pre-approved by Landlord in writing. Tenant shall use the communications service providers that Landlord has approved, and Tenant shall verify that the vendor adheres to the identification coding used by Landlord as well as all access rules. In addition, if the Tenant vacates the Premises, all communication lines must be removed by Tenant from the Building and Premises unless prior written authorization is given by the Landlord.

**22.    Recycling and Waste Management.** Tenant covenants and agrees, at its sole cost and expense, to (1) comply with all present and future Laws, orders and regulations of the federal, state, county, municipal or other governing authorities, departments, commissions, agencies and boards regarding the collection, sorting, separation and recycling of garbage, trash, rubbish and other refuse (collectively, "trash and recyclables"); (2) comply with Landlord's recycling policy as part of Landlord's sustainability practices where it may be more stringent than applicable laws; (3) sort and separate its trash and recyclables into such categories as are provided by law or Landlord's sustainability practices; and (4) place each separately sorted category of trash and recyclables in separate receptacles as directed by Landlord. Landlord reserves the right to refuse to collect or accept from Tenant any trash and recyclables that are not separated and sorted as required by law or as directed by Landlord and to require Tenant to arrange for such collection at Tenant's sole cost and expense, utilizing a contractor approved by Landlord. Tenant shall pay all costs, expenses, fines, penalties or damages that may be imposed on Landlord or Tenant by reason of Tenant's failure to comply with the provisions of this Section.

**<u>Special Rules and Regulations Applicable to Premises with a restaurant use (in whole or in part) – which shall control if in conflict with the above Rules and Regulations</u>**

A.    Tenant shall be permitted to have access to its Premises through the main entrance from the exterior labeled Door #2. All food, beverage, supplies and waste removal shall be directed to use Door #2. All guests, patrons and employees shall be directed to use Door #2 after standard building hours as published by Landlord.

B.    Tenant shall be pemiitted to use in accordance with all laws cleaning, sanitizing and sterilization products and materials as well as nitrogen and carbon dioxide in containers for beverage service purposes.

46

C.       Equipment and merchandise of Tenant may be placed near the glass of any door, partition, wall or window for advertising purposes, subject to building / fire codes and Landlord's prior written approval not to be unreasonably withheld. No lighted fixtures, flashing lights or signage will be affixed to any window without Landlord's advanced express written approval.

D.       Tenant shall be responsible for making sure that the restrooms are inspected and cleaned every night prior to closing.  This includes all waste removal if not already completed by janitorial service.

E.       To the extent of any conflict between the terms of Tenant's Permitted Use as specified in Section 3 of the Lease and the provisions of Rule and Regulation #15, the terms of Tenant's Permitted Use as specified in Section 3 of the Lease shall control.

F.       In the event that any other tenant makes a complaint to Landlord based on Tenant's failure to maintain applicable codes and regulations of governing authorities, both indoors and outdoors, and Tenant fails to cure such improper maintenance and/or code violation within ten (10) days following Landlord's notice, Landlord shall have the right to revoke Tenant's use of the Outdoor Seating Area, along with access and hours of operation, upon five (5) days prior written notice to Tenant.

G.       Tenant will be in control of its own HVAC system to the Premises and shall maintain such HVAC system in a good and operable condition and subject to the other provisions of this Lease. Tenant shall provide Landlord advanced notice if Tenant or Tenant's contractor(s) require access to the building's roof and will coordinate such access with Landlord or Landlord's agent(s).

## EXHIBIT E

Schedule of Base Rent

**For Initial Term of 36 months and First Renewal Period**

| PERIOD OF TERM | BASE RENT RATE PER RENTABLE SQUARE FOOT PER ANNUM | MONTHLY BASE RENT | PERIOD BASE RENT |
|---|---|---|---|
| Months 1 - 12 | $14.50 | $3,854.58 | $46,255.00 |
| Months 13 - 24 | $15.00 | $3,987.50 | $47,850.00 |
| Months 25 - 36 | $15.50 | $4,120.42 | $49,445.00 |
| Months 37- 48 | $15.97 | $4,245.00 | $50,944.00 |
| Months 49- 60 | $16.45 | $4,373.00 | $52,476.00 |
| Months 61- 72 | $16.95 | $4,506.00 | $54,071.00 |
| Months 73- 86 | $17.46 | $4,642.00 | $55,697.00 |

Based on 3,190 Rentable Square Feet of space

48

EXHIBIT F

GROSS REVENUE CERTIFICATE

UPSTATE CRAFT BEER, LLC, a South Carolina limited liability company ("Tenant"), is leasing from 400 Augusta Street Investors, LLC, a South Carolina limited liability company ("Landlord"), retail/commercial space (the "Premises") in the building located at 400 Augusta Street, Greenville, South Carolina 29601, pursuant to that certain Office Lease Agreement, dated as of _____, 2015 (the "Lease"). Pursuant to Section 28 of the Lease, Landlord has required that Tenant provide this Gross Revenue Certificate (this "Certificate"): (i) within twenty (20) calendar days of the end of each June and December starting in 2016 and (ii) at any time Tenant reasonably believes that the answer to either question 1 or 2 below exceeds twenty percent (20%). Tenant hereby certifies to Landlord that, as of the date hereof:

1.    In the six (6) months prior to the start of the current calendar month, _____% of Tenant's gross revenue from its operations at the Premises were generated from the sale to consumers of alcoholic beverages for consumption off Premises.

2.    In the six (6) months prior to the start of the current calendar month, _____% of Tenant's gross revenue from its operations at the Premises were generated from the sale of alcoholic beverages wholesale for distribution.

3.    In the six (6) months prior to the start of the current calendar month, _____% of Tenant's gross revenue from its operations at the Premises were generated from the production of alcoholic beverages on the Premises for the consumption off Premises and the sale of ingredients relating to same.

4.    In the six (6) months prior to the start of the current calendar month, _____% of Tenant's gross revenue from its operations at the Premises were generated from the sale of supplies and ingredients for the production of alcoholic beverages off Premises.

5.    In the six (6) months prior to the start of the current calendar month, _____% of Tenant's gross revenue from its operations at the Premises were generated from the sale of alcoholic beverages for consumption at or on the Premises.

6.    In the six (6) months prior to the start of the current calendar month, _____% of Tenant's gross revenue from its operations at the Premises were generated from the sale of food.

7.    In the six (6) months prior to the start of the current calendar month, _____% of Tenant's gross revenue from its operations at the Premises were generated from other sources as follows:

_____.

8.    The sum of the sources of Tenant's gross revenue described in paragraphs 1 through 7 above shall equal no less than ninety-eight percent (98%) of Tenant's gross revenue for the six (6) month period prior to the start of the current calendar month.

9.    Enclosed herewith is a balance sheet and income statement for the six (6) month period covered by this Certificate. Tenant acknowledges and agrees that it shall provide such additional materials evidencing or supporting the information set forth in this Certificate as Landlord may reasonably request.

49

∧ f

10.    The individual executing this Certificate on behalf of Tenant has the power and authority and the legal right to execute and deliver this Certificate and personal knowledge of the matters set forth in this Certificate.

IN WITNESS WHEREOF, the Tenant has caused this Gross Revenue Certificate to be duly executed on _____, 20___.

TENANT:                         UPSTATE CRAFT BEER, LLC, a South Carolina
                                limited liability company

                                By:    _____
                                Name:  _____
                                Title: _____

## EXHIBIT G

## LIEN SUBORDINATION AGREEMENT

## SECOND AMENDMENT - LEASE EXTENSION MODIFICATION  AGREEMENT

THIS   LEASE EXTENSION MODIFICATION AGREEMENT (the "Second Amendment") is made and entered into as of this 1st day of May 2018, by and between 400 **AUGUSTA STREET INVESTORS, LLC** ("Landlord") and **UPSTATE CRAFT BEER, LLC** ("Tenant").

## RECITALS

A. By that certain Lease Agreement dated March 13, 2015, as amended by (i) that certain First Amendment to Lease dated July 1, 2015 (collectively hereinafter referred to as the "Lease"); Tenant agreed to lease from Landlord and Landlord agreed to demise, lease and rent to Tenant approximately 3,190 Rentable Square Feet of space on the first floor, Suite 140, of the building located at 400 Augusta Street, Greenville, South Carolina   29601, (hereinafter referred to as the "Premises"),  for a period of thirty-six (36) months commencing on August 1, 2015, and expiring on July 31, 2018.

B. Landlord and Tenant desire to extend the Term of the Lease, and to establish the Base Rental rate during the extended Term of the Lease and to further amend the Lease as provided herein.

## TERMS OF AMENDMENT

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Lessor and Lessee hereby agree as follows:

1. **Recitals.** The foregoing recitals are true and are incorporated into this Second Amendment.

2. **Definitions.** Unless otherwise defined in this Second Amendment, all capitalized terms used in this Second Amendment shall have the respective meaning ascribed to them in the Lease.

3. **Amendments.**

    3.1 **Extension of the Lease Term.** The Term of the Lease is hereby extended for one (1) additional period of forty-eight (48) months commencing on August 1, 2018 and expiring on July 31, 2022 (the "Extension Term")

    3.2 **Base Rent Schedule During the Extension Term.** Tenant shall pay to Landlord Base Rent for the Premises, in advance, without demand, deduction or set off, during the Extension Term in accordance with the schedule below:

| Base Rent Schedule for the Premises during the Extension Term | | | |
|---|---|---|---|
| Time Period | Rental Rate Per Square Foot | Monthly Base Rent | Time Period Base Rent |
| August 1, 2018 – July 31, 2019 | $15.97 | $4,245.00 | $50,944.00 |
| August 1, 2019 – July 31, 2020 | $16.45 | $4,373.00 | $52,476.00 |
| August 1, 2020 – July 31, 2021 | $16.95 | $4,506.00 | $54,071.00 |
| August 1, 2021 – July 31, 2022 | $17.46 | $4,642.00 | $55,697.00 |

4.     **Amendment to Lease.**  This Second Amendment is an addition and a modification to the Lease. Except as otherwise modified and amended by this Second Amendment, the Lease shall remain in full force and effect. This Second Amendment may be executed in several counterparts, each of which shall be deemed an original.

IN WITNESS WHEREOF, Lessor and Lessee have executed this Lease Extension Modification Agreement as of the date first written above.

LANDLORD:  400 AUGUSTA STREET INVESTORS, LLC

By: _____

Printed Name and Title: _Stephen P. Navarro, Manager_

_Sara K. Haubold_
Witness

TENANT:     UPSATE CRAFT BEER, LLC

By: _____

Printed Name and Title: _Jack McDonald, Owner_

_Lisa Zill_
7 Witness            LISA Z/MK

## FIRST LEASE AMENDMENT AGREEMENT

To be attached to and form a part of the Office Lease Agreement dated 2015 between 400 Augusta State Street Investors, LLC, as Landlord, and Upstate Craft Beer, LLC, as Tenant, concerning the Leased Premises known as 400 Augusta Street, Suite 140, Greenville, South Carolina 29601.

The Office Lease Agreement is hereby amended as set forth below on the condition that Tenant and Landlord continue to comply with all of the other provisions, covenants, and agreements contained in the Office Lease Agreement:

LEASE SUMMARY
G. Commencement Date.  Replace the sentence with the following: "August 1, 2015, subject to adjustment per Section 2."

2. LEASE TERM.  Replace the first sentence with the following: "The term of this Lease (hereinafter referred to as either the "Lease Term" or "Term") is for thirty-six (36) months, and shall commence on August 1, 2015 ("the Commencement Date") and shall expire (unless sooner terminated or extended as herein provided) at midnight on the last day of the calendar month that is thirty-six (36) months after the Commencement Date (hereinafter referred to as the "Expiration Date").

The parties have signed this First Lease Amendment Agreement on the dates indicated below.


UPSTATE CRAFT BEER, LLC
Tenant

_____    _____
Jack McDonald                       Date
President


400 AUGUSTA STREET INVESTORS, LLC
Landlord

_____    _____
StepKerT A. Navarro                 Date
Manager

## THIRD AMENDMENT - LEASE EXTENSION MODIFICATION AGREEMENT

THIS LEASE EXTENSION MODIFICATION AGREEMENT (the "Third Amendment") is made and entered into as of this __24__ day of March 2022, by and between **400 AUGUSTA STREET INVESTORS, LLC** ("Landlord") and **UPSTATE CRAFT BEER, LLC** d/b/a The Eighth State Brewing Company ("Tenant").

## RECITALS

A. By that certain Lease Agreement dated March 13, 2015, as amended by (i) that certain First Lease Amendment Agreement dated July 1, 2015, and (ii) that certain Second Amendment – Lease Extension Modification dated May 1, 2018 (collectively hereinafter referred to as the "Lease"); Tenant agreed to lease from Landlord and Landlord agreed to demise, lease and rent to Tenant approximately 3,190 Rentable Square Feet of space on the first floor, Suite 140, of the building located at 400 Augusta Street, Greenville, South Carolina 29601, (hereinafter referred to as the "Premises"), for a period of thirty-six (36) months commencing on August 1, 2015, and expiring on July 31, 2022.

B. Landlord and Tenant desire to extend the Term of the Lease, and to establish the Base Rental rate during the extended Term of the Lease and to further amend the Lease as provided herein.

## TERMS OF AMENDMENT

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Lessor and Lessee hereby agree as follows:

1. **Recitals.** The foregoing recitals are true and are incorporated into this Second Amendment.

2. **Definitions.** Unless otherwise defined in this Second Amendment, all capitalized terms used in this Second Amendment shall have the respective meaning ascribed to them in the Lease.

3. **Amendments.**

   3.1 **Extension of the Lease Term.** The Term of the Lease is hereby extended for one (1) additional period of forty-eight (48) months commencing on August 1, 2022, and expiring on July 31, 2026 (the"Second Extension Term")

   3.2 **Base Rent Schedule During the Extension Term.** Tenant shall pay to Landlord Base Rent for the Premises, in advance, without demand, deduction or set off, during the Extension Term in accordance with the schedule below:

| Base Rent Schedule for the Premises during the Extension Term | | | |
|---|---|---|---|
| **Time Period** | **Rental Rate Per Square Foot** | **Monthly Base Rent** | **Time Period Base Rent** |
| August 1, 2022 – July 31, 2023 | $17.98 | $4,779.68 | $57,356.20 |
| August 1, 2023 – July 31, 2024 | $18.52 | $4,923.07 | $59,076.89 |
| August 1, 2024 – July 31, 2025 | $19.07 | $5,070.77 | $60,849.19 |
| August 1, 2025 – July 31, 2026 | $19.65 | $5,222.89 | $62,674.67 |

4.        **Renewal Period**: Provided Tenant is not then in default in the performance of any term or condition of this Lease, Tenant shall have the option to renew this Lease for one (1) period of forty-eight (48) months commencing on the day immediately following the Expiration Date, and ending forty-eight (48) months thereafter (the "Renewal Period"). The Base Rent in the Renewal Period will be the fair market value as determined below but in no event shall the Base Rent in the Renewal Period be less than the Base Rent for the last year of the last Renewal Period.

The Renewal Period shall be exercisable by Tenant giving written notice to Landlord in accordance with this Lease of its intention to exercise the Renewal Period at least two hundred seventy (270) days prior to expiration of the Term (the "Renewal Period Notice"). In the event Tenant shall exercise its right to extend the Term, the terms and conditions of this Lease shall be applicable to the Renewal Period; provided, however, the Base Rent for the Renewal Period shall be the fair market value determined as follows: Landlord shall deliver in writing to Tenant the fair market value Base Rent ("Renewal Period Rent Notice") within thirty (30) days of receipt of the Renewal Period Notice. Landlord's selection of the Base Rent shall be based on rental rates being offered in the Building or in the market area surrounding the Building for similar space to the Premises. In the event that Tenant does not agree with the rent contained in the Renewal Period Rent Notice, Tenant may send to Landlord a written notice of objection within fifteen (15) days after Tenant's receipt of the Renewal Period Rent Notice. Upon receipt of such Tenant objection notice, Landlord and Tenant shall have a period of forty-five (45) days to mutually agree upon the Base Rent for the Renewal Period, and if Landlord and Tenant reach agreement on the Base Rent for the Renewal Period, Landlord and Tenant shall enter into a lease amendment to reflect such agreement. If after said forty-five-day negotiation period, Landlord and Tenant have not agreed upon the Base Rent for the Renewal Period, Tenant shall have the right to rescind its Renewal Period Notice within ten (10) days after the expiration of the 45-day negotiation period. If Tenant does not send a notice of objection within the initial 15-day period, the Base Rent for the Renewal Period shall be the Base Rent set forth in the Renewal Period Rent Notice. If (i) Tenant does send a notice of objection during said 15-day period, (ii) Landlord and Tenant do not reach an agreement on Base Rent during the 45-day negotiation period and (iii) Tenant does not rescind its Renewal Period Notice within 10 days after the expiration of the 45-day negotiation period, the Base Rent for the Second Renewal Period shall be the Base Rent set forth in the Second Renewal Period Rent Notice.

5.        **Change of Notice Address**. Within Section 20, Notices, of the Lease, the Legal Notice Address for Landlord shall be deleted and replaced with the following address:

> 400 Augusta Street Investors, LLC
> 355 S. Main Street, Suite 903
> Greenville, SC 29601

All other address of Section 20 shall remain unchanged.

6.        **Broker's Commissions**. Section 23 of the Lease shall be deleted in its entirety.

7.        **New Market Tax Credit Compliance**. Section 28 of the Lease shall be deleted and shall be replaced with the following:

Tenant shall deliver to Landlord a completed Gross Revenue Certificate in the form attached hereto Exhibit F (the "Gross Revenue Certificate") within (i) twenty (20) calendar days of the end of each June and December starting in 2022 and continuing throughout the term.

8. **Personal Guaranty**. This Third Amendment shall eliminate the personal guarantees of Jack McDonald, James Ryan, and William Hardin in all respects.

9. **First Right of Refusal**. Section 31 of the Lease shall be deleted in its entirety.

10. **Amendment to Lease.** This Third Amendment is an addition and a modification to the Lease. Except as otherwise modified and amended by this Third Amendment, the Lease shall remain in full force and effect. This Second Amendment may be executed in several counterparts, each of which shall be deemed an original.

 **IN WITNESS WHEREOF,** Lessor and Lessee have executed this Lease Extension Modification Agreement as of the date first written above.

LANDLORD: 400 AUGUSTA STREET INVESTORS, LLC

By: _____

Printed Name and Title:  Stephen P. Navarro, Manager

_Sara K Haubold_
Witness

TENANT: UPSATE CRAFT BEER, LLC

By: _____

Printed Name:  Jack McDonald

Print Title:  Owner

Witness

## EXHIBIT F TO THIRD AMENDMENT - LEASE EXTENSION
## MODIFICATION AGREEMENT

### GROSS REVENUE CERTIFICATE

UPSTATE CRAFT BEER, LLC, a South Carolina limited liability company ("Tenant"), is leasing from 400 Augusta Street Investors, LLC, a South Carolina limited liability company ("Landlord"), retail/commercial space (the "Premises") in the building located at 400 Augusta Street, Greenville, South Carolina 29601, pursuant to that certain Lease Agreement, dated as of __, 2015 (the "Lease"), and as extended. Pursuant to Section 28 of the Lease, Landlord has required that Tenant provide this Gross Revenue Certificate, (this "Certificate"): (i) within twenty (20) calendar days of the end of each June and December starting in 2022. Tenant hereby certifies to Landlord that, as of the date hereof:

1. In the six (6) months prior to the start of the current calendar month, _____% of Tenant's gross revenue from its operations at the Premises were generated from the sale to consumers of alcoholic beverages for consumption off Premises.

2. In the six (6) months prior to the start of the current calendar month, _____% of Tenant's gross revenue from its operations at the Premises were generated from the sale of alcoholic beverages wholesale for distribution.

3. In the six (6) months prior to the start of the current calendar month, _____% of Tenant's gross revenue from its operations at the Premises were generated from the production of alcoholic beverages on the Premises for the consumption off Premises and the sale of ingredients relating to same.

4. In the six (6) months prior to the start of the current calendar month, _____% of Tenant's gross revenue from its operations at the Premises were generated from the sale of supplies and ingredients for the production of alcoholic beverages off Premises.

5. In the six (6) months prior to the start of the current calendar month, _____% of Tenant's gross revenue from its operations at the Premises were generated from the sale of alcoholic beverages for consumption at or on the Premises.

6. In the six (6) months prior to the start of the current calendar month, _____% of Tenant's gross revenue from its operations at the Premises were generated from the sale of food.

7. In the six (6) months prior to the start of the current calendar month, _____% of Tenant's gross revenue from its operations at the Premises were generated from other sources as follows:

_____.

8. Enclosed herewith is a balance sheet and income statement for the six (6) month period covered by this Certificate. Tenant acknowledges and agrees that it shall provide such additional materials evidencing or supporting the information set forth in this Certificate as Landlord may reasonably request.